# KLEINDIENST, ATTORNEY GENERAL, ET AL. *v.* MANDEL ET AL.

No. 71–16.   Argued April 18, 1972—Decided June 29, 1972

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 770. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 774.

*Deputy Solicitor General Friedman* argued the cause for appellants. On the briefs were *Solicitor General Griswold, Assistant Attorney General Mardian, A. Raymond Randolph, Jr., Robert L. Keuch, Edward S. Christenbury,* and *Lee B. Anderson.*

*Leonard B. Boudin* argued the cause for appellees. With him on the brief were *Victor Rabinowitz* and *David Rosenberg.*

*David Carliner* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The appellees have framed the issue here as follows:

> "Does appellants' action in refusing to allow an alien scholar to enter the country to attend academic meetings violate the First Amendment rights of American scholars and students who had invited him?"[1]

Expressed in statutory terms, the question is whether §§ 212 (a)(28)(D) and (G)(v) and § 212 (d)(3)(A) of the Immigration and Nationality Act of 1952, 66 Stat. 182, 8 U. S. C. §§ 1182 (a)(28)(D) and (G)(v) and § 1182 (d)(3)(A), providing that certain aliens "shall be ineligible to receive visas and shall be excluded from admission into the United States" unless the Attorney General, in his discretion, upon recommendation by the Secretary of State or a consular officer, waives inadmissibility and approves temporary admission, are unconstitutional as applied here in that they deprive American citizens of freedom of speech guaranteed by the First Amendment.

---

[1] Brief for Appellees 1.

The challenged provisions of the statute are:

"Section 212 (a). Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

. . . . .

"(28) Aliens who are, or at any time have been, members of any of the following classes:

. . . . .

"(D) Aliens not within any of the other provisions of this paragraph who advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship . . . .

. . . . .

"(G) Aliens who write or publish . . . (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship; . . .

"(d)

. . . . .

"(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under one or more of the paragraphs enumerated in subsection (a) . . . may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General . . . ."

Section 212 (d) (6) provides that the Attorney General "shall make a detailed report to the Congress in any

case in which he exercises his authority under paragraph (3) of this subsection on behalf of any alien excludable under paragraphs (9), (10), and (28) . . . ."

I

Ernest E. Mandel resides in Brussels, Belgium, and is a Belgian citizen. He is a professional journalist and is editor-in-chief of the Belgian Left Socialist weekly La Gauche. He is author of a two-volume work entitled Marxist Economic Theory published in 1969. He asserted in his visa applications that he is not a member of the Communist Party. He has described himself, however, as "a revolutionary Marxist." [2] He does not dispute, see 325 F. Supp. 620, 624, that he advocates the economic, governmental, and international doctrines of world communism.[3]

Mandel was admitted to the United States temporarily in 1962 and again in 1968. On the first visit he came as a working journalist. On the second he accepted invitations to speak at a number of universities and colleges. On each occasion, although apparently he was not then aware of it, his admission followed a finding of ineligibility under § 212 (a)(28), and the Attorney General's exercise of discretion to admit him temporarily, on recommendation of the Secretary of State, as § 212 (d)(3)(A) permits.

On September 8, 1969, Mandel applied to the American Consul in Brussels for a nonimmigrant visa to enter the United States in October for a six-day period, during which he would participate in a conference on

[2] E. Mandel, Revolutionary Strategy in the Imperialist Countries (1969), reprinted in App. 54–66.

[3] Appellees, while suggesting that § 101 (a)(40), defining "world communism," and § 212 (a)(28)(D) are unacceptably vague, "do not contest the fact that appellants can and do conclude that Dr. Mandel's Marxist economic philosophy falls within the scope of these vague provisions." Brief for Appellees 10 n. 8.

Technology and the Third World at Stanford University.[4] He had been invited to Stanford by the Graduate Student Association there. The invitation stated that John Kenneth Galbraith would present the keynote address and that Mandel would be expected to participate in an ensuing panel discussion and to give a major address the following day. The University, through the office of its president, "heartily endorse[d]" the invitation. When Mandel's intended visit became known, additional invitations for lectures and conference participations came to him from members of the faculties at Princeton, Amherst, Columbia, and Vassar, from groups in Cambridge, Massachusetts, and New York City, and from others. One conference, to be in New York City, was sponsored jointly by the Bertrand Russell Peace Foundation and the Socialist Scholars Conference; Mandel's assigned subject there was "Revolutionary Strategy in Imperialist Countries." Mandel then filed a second visa application proposing a more extensive itinerary and a stay of greater duration.

On October 23 the Consul at Brussels informed Mandel orally that his application of September 8 had been refused. This was confirmed in writing on October 30. The Consul's letter advised him of the finding of inadmissibility under § 212 (a)(28) in 1962, the waivers in that year and in 1968, and the current denial of a waiver. It said, however, that another request for waiver was being forwarded to Washington in connection with Mandel's second application for a visa. The Department of State, by a letter dated November 6

[4] Entry presumably was claimed as a nonimmigrant alien under § 101 (a) (15) (H) of the Act, 8 U. S. C. § 1101 (a) (15) (H), namely, "an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform services of an exceptional nature requiring such merit and ability . . . ."

from its Bureau of Security and Consular Affairs to Mandel's New York attorney, asserted that the earlier waivers had been granted on condition that Mandel conform to his itinerary and limit his activities to the stated purposes of his trip, but that on his 1968 visit he had engaged in activities beyond the stated purposes.[5] For this reason, it was said, a waiver "was

---

[5] MR. JUSTICE DOUGLAS in his dissent, post, at 773 n. 4, states that Mandel's noncompliance with the conditions imposed for his 1968 visit "appear merely to have been his speaking at more universities than his visa application indicated." The letter dated November 6, 1969, from the Bureau of Security and Consular Affairs of the Department of State to Mandel's New York counsel observed: "On his 1968 visit, Mr. Mandel engaged in activities beyond the stated purposes of his trip. For this reason, a waiver of ineligibility was not sought in connection with his September visa application."

Counsel's affidavit in support of appellees' motion for the convening of a three-judge court and for the issuance of a preliminary injunction stated:

"Mr. Mandel further assured the Consul by letter on November 10, 1969 that he would not appear at any assembly in the United States at which money was solicited for any political cause. This was apparently in response to a charge that he had been present at such a solicitation during his 1968 tour. (See also Exhibit L.)

"Of course, just as Mr. Mandel had no prior notice that he was required to adhere to a stated itinerary in 1968, so Mr. Mandel was not aware that he was forbidden from appearing where contributions [were] solicited for political causes. I have been advised by Mr. George Novack, an American citizen, who coordinated Mr. Mandel's 1968 tour, that in fact the event in question was a cocktail reception held at the Gotham Art Theatre in New York City on October 19, 1968. Mr. Mandel addressed the gathering on the events in France during May and June. Later that evening posters by French students were auctioned. The money was sent to aid the legal defense of students who had taken part in the spring demonstrations. Mr. Mandel did not participate in the fund raising. (See Ex. L, Oct. 30, 1969 letter.)"

The asserted noncompliance by Mandel is therefore broader than mere acceptance of more speaking engagements than his visa application indicated.

not sought in connection with his September visa application." The Department went on to say, however, that it had now learned that Mandel might not have been aware in 1968 of the conditions and limitations attached to his visa issuance, and that, in view of this and upon his assurances that he would conform to his stated itinerary and purposes, the Department was reconsidering his case. On December 1 the Consul at Brussels informed Mandel that his visa had been refused.

The Department of State in fact had recommended to the Attorney General that Mandel's ineligibility be waived with respect to his October visa application. The Immigration and Naturalization Service, however, acting on behalf of the Attorney General, see 28 U. S. C. § 510, in a letter dated February 13, 1970, to New York counsel stated that it had determined that Mandel's 1968 activities while in the United States "went far beyond the stated purposes of his trip, on the basis of which his admission had been authorized and represented a flagrant abuse of the opportunities afforded him to express his views in this country." The letter concluded that favorable exercise of discretion, provided for under the Act, was not warranted and that Mandel's temporary admission was not authorized.

Mandel's address to the New York meeting was then delivered by transatlantic telephone.

In March Mandel and six of the other appellees instituted the present action against the Attorney General and the Secretary of State. The two remaining appellees soon came into the lawsuit by an amendment to the complaint. All the appellees who joined Mandel in this action are United States citizens and are university professors in various fields of the social sciences. They are persons who invited Mandel to speak at universities and other forums in the United States or who expected to participate in colloquia with him so that,

as the complaint alleged, "they may hear his views and engage him in a free and open academic exchange."

Plaintiff-appellees claim that the statutes are unconstitutional on their face and as applied in that they deprive the American plaintiffs of their First and Fifth Amendment rights. Specifically, these plaintiffs claim that the statutes prevent them from hearing and meeting with Mandel in person for discussions, in contravention of the First Amendment; that §212 (a)(28) denies them equal protection by permitting entry of "rightists" but not "leftists" and that the same section deprives them of procedural due process; that § 212 (d)(3)(A) is an unconstitutional delegation of congressional power to the Attorney General because of its broad terms, lack of standards, and lack of prescribed procedures; and that application of the statutes to Mandel was "arbitrary and capricious" because there was no basis in fact for concluding that he was ineligible, and no rational reason or basis in fact for denying him a waiver once he was determined ineligible. Declaratory and injunctive relief was sought.

A three-judge district court was duly convened. The case was tried on the pleadings and affidavits with exhibits. Two judges held that, although Mandel had no personal right to enter the United States, citizens of this country have a First Amendment right to have him enter and to hear him explain and seek to defend his views. The court then entered a declaratory judgment that § 212 (a)(28) and § 212 (d)(3)(A) were invalid and void insofar as they had been or might be invoked by the defendants to find Mandel ineligible for admission. The defendants were enjoined from implementing and enforcing those statutes so as to deny Mandel admission as a nonimmigrant visitor. 325 F. Supp. 620 (EDNY 1971). Judge Bartels dissented. *Id.,* at 637. Probable jurisdiction was noted. 404 U. S. 1013 (1972).

## II

Until 1875 alien migration to the United States was unrestricted. The Act of March 3, 1875, 18 Stat. 477, barred convicts and prostitutes. Seven years later Congress passed the first general immigration statute. Act of Aug. 3, 1882, 22 Stat. 214. Other legislation followed. A general revision of the immigration laws was effected by the Act of Mar. 3, 1903, 32 Stat. 1213. Section 2 of that Act made ineligible for admission "anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States or of all government or of all forms of law." By the Act of Oct. 16, 1918, 40 Stat. 1012, Congress expanded the provisions for the exclusion of subversive aliens. Title II of the Alien Registration Act of 1940, 54 Stat. 671, amended the 1918 Act to bar aliens who, at any time, had advocated or were members of or affiliated with organizations that advocated violent overthrow of the United States Government.

In the years that followed, after extensive investigation and numerous reports by congressional committees, see *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 94 n. 37 (1961), Congress passed the Internal Security Act of 1950, 64 Stat. 987. This Act dispensed with the requirement of the 1940 Act of a finding in each case, with respect to members of the Communist Party, that the party did in fact advocate violent overthrow of the Government. These provisions were carried forward into the Immigration and Nationality Act of 1952.

We thus have almost continuous attention on the part of Congress since 1875 to the problems of immigration and of excludability of certain defined classes of aliens. The pattern generally has been one of in-

creasing control with particular attention, for almost 70 years now, first to anarchists and then to those with communist affiliation or views.

## III

It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise. *United States ex rel. Turner* v. *Williams,* 194 U. S. 279, 292 (1904); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U. S. 537, 542 (1950); *Galvan* v. *Press,* 347 U. S. 522, 530–532 (1954); see *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 592 (1952).

The appellees concede this. Brief for Appellees 33; Tr. of Oral Arg. 28. Indeed, the American appellees assert that "they sue to enforce their rights, individually and as members of the American public, and assert none on the part of the invited alien." Brief for Appellees 14. "Dr. Mandel is in a sense made a plaintiff because he is symbolic of the problem." Tr. of Oral Arg. 22.

The case, therefore, comes down to the narrow issue whether the First Amendment confers upon the appellee professors, because they wish to hear, speak, and debate with Mandel in person, the ability to determine that Mandel should be permitted to enter the country or, in other words, to compel the Attorney General to allow Mandel's admission.

## IV

In a variety of contexts this Court has referred to a First Amendment right to "receive information and ideas":

"It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily

protects the right to receive . . . .' *Martin* v. *City of Struthers,* 319 U. S. 141, 143 (1943) . . . ." *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969).

This was one basis for the decision in *Thomas* v. *Collins,* 323 U. S. 516 (1945). The Court there held that a labor organizer's right to speak and the rights of workers "to hear what he had to say," *id.,* at 534, were both abridged by a state law requiring organizers to register before soliciting union membership. In a very different situation, MR. JUSTICE WHITE, speaking for a unanimous Court upholding the FCC's "fairness doctrine" in *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 386–390 (1969), said:

> "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC." *Id.,* at 390.

And in *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965), the Court held that a statute permitting the Government to hold "communist political propaganda" arriving in the mails from abroad unless the addressee affirmatively requested in writing that it be delivered to him placed an unjustifiable burden on the addressee's First Amendment right. This Court has recognized that this right is "nowhere more vital" than in our schools and universities. *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960); *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957) (plurality opinion); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967). See *Epperson* v. *Arkansas,* 393 U. S. 97 (1968).

In the present case, the District Court majority held:

> "The concern of the First Amendment is not with a non-resident alien's individual and personal interest in entering and being heard, but with the rights of the citizens of the country to have the alien enter and to hear him explain and seek to defend his views; that, as *Garrison* [v. *Louisiana,* 379 U. S. 64 (1964)] and *Red Lion* observe, is of the essence of self-government." 325 F. Supp., at 631.

The Government disputes this conclusion on two grounds. First, it argues that exclusion of Mandel involves no restriction on First Amendment rights at all since what is restricted is "only action—the action of the alien in coming into this country." Brief for Appellants 29. Principal reliance is placed on *Zemel* v. *Rusk*, 381 U. S. 1 (1965), where the Government's refusal to validate an American passport for travel to Cuba was upheld. The rights asserted there were those of the passport applicant himself. The Court held that his right to travel and his asserted ancillary right to inform himself about Cuba did not outweigh substantial "foreign policy considerations affecting all citizens" that, with the backdrop of the Cuban missile crisis, were characterized as the "weightiest considerations of national security." *Id.,* at 13, 16. The rights asserted here, in some contrast, are those of American academics who have invited Mandel to participate with them in colloquia, debates, and discussion in the United States. In light of the Court's previous decisions concerning the "right to receive information," we cannot realistically say that the problem facing us disappears entirely or is nonexistent because the mode of regulation bears directly on physical movement. In *Thomas* the registration requirement on its

face concerned only action. In *Lamont,* too, the face of the regulation dealt only with the Government's undisputed power to control physical entry of mail into the country. See *United States* v. *Robel,* 389 U. S. 258, 263 (1967).

The Government also suggests that the First Amendment is inapplicable because appellees have free access to Mandel's ideas through his books and speeches, and because "technological developments," such as tapes or telephone hook-ups, readily supplant his physical presence. This argument overlooks what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning. While alternative means of access to Mandel's ideas might be a relevant factor were we called upon to balance First Amendment rights against governmental regulatory interests—a balance we find unnecessary here in light of the discussion that follows in Part V—we are loath to hold on this record that existence of other alternatives extinguishes altogether any constitutional interest on the part of the appellees in this particular form of access.

V

Recognition that First Amendment rights are implicated, however, is not dispositive of our inquiry here. In accord with ancient principles of the international law of nation-states, the Court in *The Chinese Exclusion Case,* 130 U. S. 581, 609 (1889), and in *Fong Yue Ting* v. *United States,* 149 U. S. 698 (1893), held broadly, as the Government describes it, Brief for Appellants 20, that the power to exclude aliens is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government . . . ." Since that time, the Court's general reaffirmations of this principle have

been legion.[6]  The Court without exception has sustained Congress' "plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden." *Boutilier* v. *Immigration and Naturalization Service,* 387 U. S. 118, 123 (1967).  "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320, 339 (1909).  In *Lem Moon Sing* v. *United States,* 158 U. S. 538, 547 (1895), the first Mr. Justice Harlan said:

> "The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications."

Mr. Justice Frankfurter ably articulated this history in *Galvan* v. *Press,* 347 U. S. 522 (1954), a deportation case, and we can do no better.  After suggesting, at 530, that "much could be said for the view" that due process places some limitations on congresssional power in this area "were we writing on a clean slate," he continued:

> "But the slate is not clean.  As to the extent of the power of Congress under review, there is not merely 'a page of history' . . . but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with

---

[6] See, for example, *Ekiu* v. *United States,* 142 U. S. 651, 659 (1892); *Fok Yung Yo* v. *United States,* 185 U. S. 296, 302 (1902); *United States ex rel. Turner* v. *Williams,* 194 U. S. 279, 294 (1904); *Keller* v. *United States,* 213 U. S. 138, 143–144 (1909); *Mahler* v. *Eby,* 264 U. S. 32, 40 (1924); *Shaughnessy* v. *Mezei,* 345 U. S. 206, 210 (1953); cf. *Graham* v. *Richardson,* 403 U. S. 365, 377 (1971).

the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. . . . But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government. . . .

"We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens . . . ." *Id.,* at 531–532.

We are not inclined in the present context to reconsider this line of cases. Indeed, the appellees, in contrast to the *amicus,* do not ask that we do so. The appellees recognize the force of these many precedents. In seeking to sustain the decision below, they concede that Congress could enact a blanket prohibition against entry of all aliens falling into the class defined by §§ 212 (a)(28)(D) and (G)(v), and that First Amendment rights could not override that decision. Brief for Appellees 16. But they contend that by providing a waiver procedure, Congress clearly intended that persons ineligible under the broad provision of the section would be temporarily admitted when appropriate "for humane reasons and for reasons of public interest." S. Rep. No. 1137, 82d Cong., 2d Sess., 12 (1952). They argue that the Executive's implementation of this congressional mandate through decision whether to grant a waiver in each individual case must be limited by the First Amendment rights of persons like appellees. Specifically, their position is that the First Amendment rights must prevail, at least where the Gov-

ernment advances no justification for failing to grant a waiver. They point to the fact that waivers have been granted in the vast majority of cases.[7]

Appellees' First Amendment argument would prove too much. In almost every instance of an alien excludable under § 212 (a)(28), there are probably those who would wish to meet and speak with him. The ideas of most such aliens might not be so influential as those of Mandel, nor his American audience so numerous, nor the planned discussion forums so impressive. But the First Amendment does not protect only the articulate, the well known, and the popular. Were we to endorse the proposition that governmental power to withhold a waiver must yield whenever a bona fide claim is made that American citizens wish to meet and talk with an alien excludable under § 212 (a)(28), one of two unsatisfactory results would necessarily ensue. Either every claim would prevail, in which case the plenary discretionary authority Congress granted the Executive becomes a nullity, or

---

[7] The Government's brief states:

"The Immigration and Naturalization Service reports the following with respect to applications to the Attorney General for waiver of an alien's ineligibility for admission under Section 212 (a)(28):

| "Year | Total Number of Applications for Waiver of Section 212 (a)(28) | Number of Waivers Granted | Number of Waivers Denied |
|---|---|---|---|
| 1971 | 6210 | 6196 | 14 |
| 1970 | 6193 | 6189 | 4 |
| 1969 | 4993 | 4984 | 9 |
| 1968 | 4184 | 4176 | 8 |
| 1967 | 3860 | 3852 | 8" |

Brief for Appellants 18 n. 24. These cases, however, are only those that, as § 212 (d)(3)(A) provides, come to the Attorney General with a positive recommendation from the Secretary of State or the consular officer. The figures do not include those cases where these officials had refrained from making a positive recommendation.

courts in each case would be required to weigh the strength of the audience's interest against that of the Government in refusing a waiver to the particular alien applicant, according to some as yet undetermined standard. The dangers and the undesirability of making that determination on the basis of factors such as the size of the audience or the probity of the speaker's ideas are obvious. Indeed, it is for precisely this reason that the waiver decision has, properly, been placed in the hands of the Executive.

Appellees seek to soften the impact of this analysis by arguing, as has been noted, that the First Amendment claim should prevail, at least where no justification is advanced for denial of a waiver. Brief for Appellees 26. The Government would have us reach this question, urging a broad decision that Congress has delegated the waiver decision to the Executive in its sole and unfettered discretion, and any reason or no reason may be given. See *Jay* v. *Boyd,* 351 U. S. 345, 357–358 (1956); *Hintopoulos* v. *Shaughnessy,* 353 U. S. 72, 77 (1957); *Kimm* v. *Rosenberg,* 363 U. S. 405, 408 (1960). This record, however, does not require that we do so, for the Attorney General did inform Mandel's counsel of the reason for refusing him a waiver. And that reason was facially legitimate and bona fide.

The Government has chosen not to rely on the letter to counsel either in the District Court or here. The fact remains, however, that the official empowered to make the decision stated that he denied a waiver because he concluded that previous abuses by Mandel made it inappropriate to grant a waiver again. With this, we think the Attorney General validly exercised the plenary power that Congress delegated to the Executive by §§ 212 (a) (28) and (d)(3).

In summary, plenary congressional power to make policies and rules for exclusion of aliens has long been

firmly established. In the case of an alien excludable under § 212 (a) (28), Congress has delegated conditional exercise of this power to the Executive. We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant. What First Amendment or other grounds may be available for attacking exercise of discretion for which no justification whatsoever is advanced is a question we neither address nor decide in this case.

*Reversed.*

Mr. Justice Douglas, dissenting.

Under *The Chinese Exclusion Case,* 130 U. S. 581, rendered in 1889, there could be no doubt but that Congress would have the power to exclude any class of aliens from these shores. The accent at the time was on race. Mr. Justice Field, writing for the Court, said: "If, therefore, the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed because at the time there are no actual hostilities with the nation of which the foreigners are subjects." *Id.,* at 606.

An ideological test, not a racial one, is used here. But neither, in my view, is permissible, as I have indicated on other occasions.[1] Yet a narrower question is raised here. Under the present Act aliens who advocate or teach "the economic, international, and governmental doctrines of world communism" are ineligible to receive

---

[1] See *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 598 (dissenting opinion); *Galvan* v. *Press,* 347 U. S. 522, 533 (dissenting opinion).

visas "[e]xcept as otherwise provided in this Act."[2] The "except" provision is contained in another part of the same section[3] and states that an inadmissible alien "may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer" be admitted "temporarily despite his inadmissibility."

Dr. Ernest Mandel, who is described as "an orthodox Marxist of the Trotskyist school," has been admitted to this country twice before—once as a working journalist in 1962 and once as a lecturer in 1968. The present case involves his third application, made in 1969, to attend a conference at Stanford University on Technology and the Third World. He was also invited to attend other conferences, one at MIT, and to address several universities, Princeton, Amherst, the New School, Columbia, and Vassar. This time the Department of Justice refused to grant a waiver recommended by the State Department; and it claims that it need not state its reasons, that the power of the Attorney General is unfettered.

Dr. Mandel is not the sole complainant. Joining him are the other appellees who represent the various audiences which Dr. Mandel would be meeting were a visa to issue. While Dr. Mandel, an alien who seeks admission, has no First Amendment rights while outside the Nation, the other appellees are on a different footing. The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know. *Martin* v. *City of Struthers*, 319 U. S. 141, 143; *Stanley* v. *Georgia*, 394 U. S. 557, 564.

Can the Attorney General under the broad discretion entrusted in him decide

---

[2] § 212 (a) (28) (G) (v) of the Immigration and Nationality Act of 1952, 66 Stat. 185, 8 U. S. C. § 1182 (a) (28) (G) (v).

[3] § 212 (d) (3) (A), 8 U. S. C. § 1182 (d) (3) (A).

that one who maintains that the earth is round can be excluded?

that no one who believes in the Darwinian theory shall be admitted?

that those who promote a Rule of Law to settle international differences rather than a Rule of Force may be barred?

that a genetic biologist who lectures on the way to create life by one sex alone is beyond the pale?

that an exponent of plate tectonics can be barred?

that one should be excluded who taught that Jesus when he arose from the Sepulcher, went east (not up) and became a teacher at Hemis Monastery in the Himalayas?

I put the issue that bluntly because national security is not involved. Nor is the infiltration of saboteurs. The Attorney General stands astride our international terminals that bring people here to bar those whose ideas are not acceptable to him. Even assuming, *arguendo,* that those on the outside seeking admission have no standing to complain, those who hope to benefit from the traveler's lectures do.

Thought control is not within the competence of any branch of government. Those who live here may need exposure to the ideas of people of many faiths and many creeds to further their education. We should construe the Act generously by that First Amendment standard, saying that once the State Department has concluded that our foreign relations permit or require the admission of a foreign traveler, the Attorney General is left only problems of national security, importation of heroin, or other like matters within his competence.

We should assume that where propagation of ideas is permissible as being within our constitutional framework, the Congress did not undertake to make the Attorney General a censor. For as stated by Justice

Jackson in *Thomas* v. *Collins,* 323 U. S. 516, 545 (concurring), "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us."

In *Brandenburg* v. *Ohio,* 395 U. S. 444 (which overruled *Whitney* v. *California,* 274 U. S. 357), we held that the First Amendment does not permit a State "to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.,* at 447. That case involved propagation of the views of the Ku Klux Klan. The present case involves teaching the communist creed.[4] But, as we held in *Noto* v. *United States,* 367 U. S. 290, 297–298:

> "[T]he mere abstract teaching of Communist theory, including the teaching of the moral pro-

---

[4] The Court recognizes the legitimacy of appellees' First Amendment claim, *ante,* at 762–765. It argues, however, that inasmuch as the Attorney General gave a "facially legitimate and bona fide" reason to refuse Dr. Mandel a waiver of ineligibility, the Court should not "look behind the exercise of that discretion, nor test it by balancing its justification against [appellees'] First Amendment interests . . . ." First, so far as the record reveals, there is absolutely no support for the Attorney General's claim that Dr. Mandel consciously abused his visa privileges in 1968. Indeed, the State Department itself concedes that he *"was apparently not informed [in 1962 and 1968] that a visa was issued only after obtaining a waiver of ineligibility and therefore may not have been aware of the conditions and limitations attached to the visa issuance."* (Emphasis supplied.) App. 22. Second, the activities which the Attorney General labeled "flagrant abuses" of Dr. Mandel's opportunity to speak in the United States appear merely to have been his speaking at more universities than his visa application indicated. Indeed, he spoke at more than

priety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."

As a matter of statutory construction, I conclude that Congress never undertook to entrust the Attorney General with the discretion to pick and choose among the ideological offerings which alien lecturers tender from our platforms, allowing those palatable to him and disallowing others.[5] The discretion entrusted to him concerns matters commonly within the competence of the Department of Justice—national security, importation of drugs, and the like.

I would affirm the judgment of the three-judge District Court.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Dr. Ernest Mandel, a citizen of Belgium, is an internationally famous Marxist scholar and journalist. He was invited to our country by a group of American scholars who wished to meet him for discussion and debate. With firm plans for conferences, colloquia and lectures, the American hosts were stunned to learn that Mandel had been refused permission to enter our country. American consular officials had found Mandel "in-

30 universities in the United States and Canada, including Harvard, the University of California at Berkeley, Swarthmore, Notre Dame, Antioch, Michigan, three appearances at Columbia, two at the University of Pennsylvania, and the keynote address at the 1968 Socialist Scholars Conference held at Rutgers. App. 25. It would be difficult to invent a more trivial reason for denying the academic community the chance to exchange views with an internationally respected scholar.

[5] As indicated in S. Rep. No. 1137, 82d Cong., 2d Sess., 12, the discretion vested in the Attorney General was to be exercised "for emergent reasons or for reasons deemed strictly in the public interest." Ideological controls are not congenial to our First Amendment traditions and therefore should not be inferred.

eligible" to receive a visa under §§ 212 (a)(28)(D) and (G)(v) of the Immigration and Nationality Act of 1952, 66 Stat. 185, which bars even temporary visits to the United States by aliens who "advocate the economic, international, and governmental doctrines of world communism" or "who write or publish . . . any written or printed matter . . . advocating or teaching" such doctrines. Under § 212 (d)(3), the Attorney General refused to waive inadmissibility.

I, too, am stunned to learn that a country with our proud heritage has refused Dr. Mandel temporary admission. I am convinced that Americans cannot be denied the opportunity to hear Dr. Mandel's views in person because their Government disapproves of his ideas. Therefore, I dissent from today's decision and would affirm the judgment of the court below.

## I

As the majority correctly demonstrates, in a variety of contexts this Court has held that the First Amendment protects the right to receive information and ideas, the freedom to hear as well as the freedom to speak. The reason for this is that the First Amendment protects a process, in Justice Brandeis' words, "reason as applied through public discussion," *Whitney* v. *California,* 274 U. S. 357, 375 (1927) (concurring opinion); and the right to speak and hear—including the right to inform others and to be informed about public issues—are inextricably part of that process. The freedom to speak and the freedom to hear are inseparable; they are two sides of the same coin. But the coin itself is the process of thought and discussion. The activity of speakers becoming listeners and listeners becoming speakers in the vital interchange of thought is the "means indispensable to the discovery and spread of political truth." *Ibid.;* see *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949). Its

protection is "a fundamental principle of the American government." *Whitney* v. *California, supra,* at 375. The First Amendment means that Government has no power to thwart the process of free discussion, to "abridge" the freedoms necessary to make that process work. See *Lamont* v. *Postmaster General,* 381 U. S. 301, 308 (1965) (BRENNAN, J., concurring, with whom Goldberg and Harlan, JJ., joined).

There can be no doubt that by denying the American appellees access to Dr. Mandel, the Government has directly prevented the free interchange of ideas guaranteed by the First Amendment.[1] It has, of course, interfered with appellees' personal rights both to hear Mandel's views and to develop and articulate their own views through interaction with Mandel. But as the court below recognized, apart from appellees' interests, there is also a "general public interest in the prevention of any stifling of political utterance." 325 F. Supp. 620, 632 (1971). And the Government has interfered with this as well.[2]

---

[1] Twenty years ago, the Bulletin of the Atomic Scientists devoted an entire issue to the problem of American visa policy and its effect on the interchange of ideas between American scholars and scientists and their foreign counterparts. The general conclusion of the editors—supported by printed statements of such men as Albert Einstein, Hans Bethe, Harold Urey, Arthur Compton, Michael Polanyi, and Raymond Aron—was that American visa policy was hurting the continuing advance of American science and learning, and harmful to our prestige abroad. Vol. 8, No. 7, Oct. 1952, pp. 210–217 (statement of Special Editor Edward Shils). The detrimental effect of American visa policy on the free exchange of ideas continues to be reported. See Comment, Opening the Floodgates to Dissident Aliens, 6 Harv. Civ. Rights-Civ. Lib. L. Rev. 141, 143–149 (1970); 11 Bulletin of the Atomic Scientists, Dec. 1955, pp. 367–373.

[2] The availability to appellees of Mandel's books and taped lectures is no substitute for live, face-to-face discussion and debate, just

## II

What is the justification for this extraordinary governmental interference with the liberty of American citizens? And by what reasoning does the Court uphold Mandel's exclusion? It is established constitutional doctrine, after all, that government may restrict First Amendment rights only if the restriction is necessary to further a compelling governmental interest. *E. g., Lamont* v. *Postmaster General, supra,* at 308; *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 546 (1963); *Shelton* v. *Tucker,* 364 U. S. 479 (1960).

A. Today's majority apparently holds that Mandel may be excluded and Americans' First Amendment rights restricted because the Attorney General has given a "facially legitimate and bona fide reason" for refusing to waive Mandel's visa ineligibility. I do not understand the source of this unusual standard. Merely "legitimate" governmental interests cannot override constitutional rights. Moreover, the majority demands only "facial" legitimacy and good faith, by which it means that this Court will never "look behind" any reason the Attorney General gives. No citation is given for this kind of unprecedented deference to the Executive,

---

as the availability to us of briefs and exhibits does not supplant the essential place of oral argument in this Court's work. Lengthy citations for this proposition, which the majority apparently concedes, are unnecessary. I simply note that in a letter to Henrik Lorenz, accepting an invitation to lecture at the University of Leiden and to discuss "the radiation problem," Albert Einstein observed that "[i]n these unfinished things, people understand one another with difficulty unless talking face to face." Quoted in Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1154 (1972).

nor can I imagine (nor am I told) the slightest justification for such a rule.[3]

Even the briefest peek behind the Attorney General's reason for refusing a waiver in this case would reveal that it is a sham. The Attorney General informed appellees' counsel that the waiver was refused because Mandel's activities on a previous American visit "went far beyond the stated purposes of his trip . . . and represented a flagrant abuse of the opportunities afforded him to express his views in this country." App. 68. But, as the Department of State had already conceded to appellees' counsel, Dr. Mandel "was apparently not informed that [his previous] visa was issued only after obtaining a waiver of ineligibility and therefore [Mandel] may not have been aware of the conditions and limitations attached to the [previous] visa issuance." App. 22. There is *no* basis in the present record for concluding that Mandel's behavior on his previous visit was a "flagrant abuse"—or even willful or knowing departure—from visa restrictions. For good reason, the Government in this litigation has *never* relied on the Attorney General's reason to justify Mandel's exclusion. In these circumstances, the Attorney General's reason cannot possibly support a decision for the Government in this case. But without even remanding for a factual hearing to see if there is *any* support for the Attorney General's determination, the majority declares that his reason is sufficient to override appellees' First Amendment interests.

B. Even if the Attorney General had given a com-

---

[3] As Judge Frankel has taught us, even the limited requirement of facially sufficient reasons for governmental action may be significant in some contexts; but it can hardly insulate the government from subsequent challenges to the actual good faith and sufficiency of the reasons. Frankel, Bench Warrants Upon the Prosecutor's Demand: A View From the Bench, 71 Col. L. Rev. 403, 414 (1971).

pelling reason for declining to grant a waiver under § 212 (d)(3)(A), this would not, for me, end the case. As I understand the statutory scheme, Mandel is "ineligible" for a visa, and therefore inadmissible, solely because, within the terms of § 212 (a)(28), he has advocated communist doctrine and has published writings advocating that doctrine. The waiver question under § 212 (d)(3)(A) is totally secondary and dependent, since it is triggered here only by a determination of (a)(28) ineligibility. The Attorney General's refusal to grant a waiver does not itself generate a new statutory basis for exclusion; he has no roving power to set new *ad hoc* standards for visa ineligibility. Rather, the Attorney General's refusal to waive ineligibility simply has the same effect as if no waiver provision existed; inadmissibility still rests on the (a)(28) determination. Thus, whether or not the Attorney General had a good reason for refusing a waiver, this Court, I think, must still face the question it tries to avoid: under our Constitution, may Mandel be declared ineligible under (a)(28)?

C. Accordingly, I turn to consider the constitutionality of the sole justification given by the Government here and below for excluding Mandel—that he "advocates and "publish[es] . . . printed matter . . . advocating . . . doctrines of world communism" within the terms of § 212 (a)(28).

Still adhering to standard First Amendment doctrine, I do not see how (a)(28) can possibly represent a compelling governmental interest that overrides appellees' interests in hearing Mandel.[4]   Unlike (a)(27) or (a)(29),

---

[4] The majority suggests that appellees "concede that Congress could enact a blanket prohibition against entry of all aliens falling into the class defined by §§ 212 (a)(28)(D) and (G)(v) and that First Amendment rights could not override that decision." This was certainly not the view of the court below, whose judgment the *appellants* alone have challenged here and appellees have moved to

(a)(28) does not claim to exclude aliens who are likely to engage in subversive activity or who represent an active and present threat to the "welfare, safety, or security of the United States." Rather, (a)(28) excludes aliens solely because they have advocated communist doctrine. Our cases make clear, however, that government has no legitimate interest in stopping the flow of ideas. It has no power to restrict the mere advocacy of communist doctrine, divorced from incitement to imminent lawless action. *Noto* v. *United States,* 367 U. S. 290, 297–298 (1961); *Brandenburg* v. *Ohio,* 395 U. S. 444, 447–449 (1969). For those who are not sure that they have attained the final and absolute truth, all ideas, even those forcefully urged, are a contribution to the ongoing political dialogue. The First Amendment represents the view of the Framers that "the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones"—"more speech." *Whitney* v. *California,* 274 U. S., at 375, 377 (Brandeis, J., concurring). If Americans want to hear about Marxist doctrine, even from advocates, government cannot intervene simply because it does not approve of the ideas. It certainly may not selectively pick and choose which ideas it will let into the country. But, as the court below put it, § 212 (a)(28) is nothing more than "a means of restraining the entry of disfavored political doctrine," 325 F. Supp., at 626, and such an enactment cannot justify the abridgment of appellees' First Amendment rights.

---

affirm. It is true that appellees have argued to this Court a ground of decision alternative to that argued and adopted below; but they have hardly *conceded* the incorrectness of what they successfully argued below. They have simply noted, at 16–17 of their brief, that even if this Court rejects the broad decision below, there would nevertheless be a separate and narrower basis for affirmance. See Tr. of Oral Arg. 24, 25–26, 41–42.

In saying these things, I am merely repeating established First Amendment law. Indeed, this Court has already applied that law in a case concerning the entry of communist doctrine from foreign lands. In *Lamont* v. *Postmaster General*, 381 U. S. 301 (1965), this Court held that the right of an American addressee to receive communist political propaganda from abroad could not be fettered by requiring the addressee to request in writing its delivery from the Post Office. See *id.*, at 308 (BRENNAN, J., concurring). The burden imposed on the right to receive information in our case is far greater than in *Lamont*, with far less justification. In *Lamont*, the challenged law merely regulated the flow of mail, and required the Postmaster General to forward detained mail immediately upon request by the addressee. By contrast, through § 212 (a)(28), the Government claims absolute power to bar Mandel permanently from academic meetings in this country. Moreover, in *Lamont*, the Government argued that its interest was not to censor content but rather to protect Americans from receiving unwanted mail. Here, Mandel's exclusion is not incident to a legitimate regulatory objective, but is based directly on the subject matter of his beliefs.

D. The heart of appellants' position in this case, and the basis for their distinguishing *Lamont*, is that the Government's power is distinctively broad and unreviewable because "[t]he regulation in question is directed at the admission of aliens." Brief for Appellants 33. Thus, in the appellants' view, this case is no different from a long line of cases holding that the power to exclude aliens is left exclusively to the "political" branches of Government, Congress, and the Executive.

These cases are not the strongest precedents in the United States Reports, and the majority's baroque approach reveals its reluctance to rely on them completely.

They include such milestones as *The Chinese Exclusion Case,* 130 U. S. 581 (1889), and *Fong Yue Ting* v. *United States,* 149 U. S. 698 (1893), in which this Court upheld the Government's power to exclude and expel Chinese aliens from our midst.

But none of these old cases must be "reconsidered" or overruled to strike down Dr. Mandel's exclusion, for none of them was concerned with the rights of American citizens. All of them involved only rights of the excluded aliens themselves. At least when the rights of Americans are involved, there is no basis for concluding that the power to exclude aliens is absolute. "When Congress' exercise of one of its enumerated powers clashes with those individual liberties protected by the Bill of Rights, it is our 'delicate and difficult task' to determine whether the resulting restriction on freedom can be tolerated." *United States* v. *Robel,* 389 U. S. 258, 264 (1967). As *Robel* and many other cases [5] show, all governmental

---

[5] In *United States* v. *Robel,* 389 U. S. 258 (1967), this Court struck down a statute making it a criminal offense for any employee of a "defense facility" to remain a member of the Communist Party, in spite of Government claims that the enactment came within the "war power." In *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964), the Government unsuccessfully sought to defend the denial of passports to American members of the Communist Party, in spite of claimed threats to the national security. In *Zemel* v. *Rusk,* 381 U. S. 1 (1965), the passport restriction on travel to Cuba was upheld because individual constitutional rights were overridden by the "weightiest considerations of national security"; but the Court rejected any assumption "that simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice." *Id.,* at 16, 17. In *Schneider* v. *Rusk,* 377 U. S. 163 (1964), the Government unsuccessfully attempted to justify a statutory inequality between naturalized and native-born citizens under the foreign relations power. And in *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965), itself, as MR. JUSTICE BRENNAN noted, the Government urged that the statute was "justified by the object of avoiding

power—even the war power, the power to maintain national security, or the power to conduct foreign affairs—is limited by the Bill of Rights. When individual freedoms of Americans are at stake, we do not blindly defer to broad claims of the Legislative Branch or Executive Branch, but rather we consider those claims in light of the individual freedoms. This should be our approach in the present case, even though the Government urges that the question of admitting aliens may involve foreign relations and national defense policies.

The majority recognizes that the right of American citizens to hear Mandel is "implicated" in our case. There were no rights of Americans involved in any of the old alien exclusion cases, and therefore their broad counsel about deference to the political branches is inapplicable. Surely a Court that can distinguish between pre-indictment and post-indictment lineups, *Kirby* v. *Illinois,* 406 U. S. 682 (1972), can distinguish between our case and cases which involve only the rights of aliens.

I do not mean to suggest that simply because some Americans wish to hear an alien speak, they can automatically compel even his temporary admission to our country. Government may prohibit aliens from even temporary admission if exclusion is necessary to protect a compelling governmental interest.[6] Actual threats to the national security, public health needs, and genuine requirements of law enforcement are the most apparent

---

the subsidization of propaganda of foreign governments which bar American propaganda"; MR. JUSTICE BRENNAN answered that the Government must act "by means and on terms which do not endanger First Amendment rights." *Id.,* at 310.

[6] I agree with the majority that courts should not inquire into such things as the "probity of the speaker's ideas." Neither should the Executive, however. Where Americans wish to hear an alien, and their claim is not a demonstrated sham, the crucial question is whether the *Government's* interest in excluding the alien is compelling.

interests that would surely be compelling.[7] But in Dr. Mandel's case, the Government has, and claims, no such compelling interest. Mandel's visit was to be temporary.[8] His "ineligibility" for a visa was based solely on § 212 (a)(28). The only governmental interest embodied in that section is the Government's desire to keep certain ideas out of circulation in this country. This is hardly a compelling governmental interest. Section (a)(28) may not be the basis for excluding an alien when Americans wish to hear him. Without any claim that Mandel "live" is an actual threat to this country, there is no difference between excluding Mandel because of his ideas and keeping his books out because of their ideas. Neither is permitted. *Lamont* v. *Postmaster General, supra.*

### III

Dr. Mandel has written about his exclusion, concluding that "[i]t demonstrates a lack of confidence" on the part of our Government "in the capacity of its supporters to combat Marxism on the battleground of ideas." He observes that he "would not be carrying any high explosives, if I had come, but only, as I did before, my revolutionary views which are well known to the public." And he wryly notes that "[i]n the nineteenth century the British ruling class, which was sure of itself, permitted Karl Marx to live as an exile in England for almost forty years." App. 54.

It is undisputed that Dr. Mandel's brief trip would involve nothing but a series of scholarly conferences and lectures. The progress of knowledge is an inter-

---

[7] It goes without saying, of course, that, once he has been admitted, any alien (like any citizen) can be punished if he incites lawless acts or commits other crimes.

[8] Such "nonimmigrants" are not covered by quotas. C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.6 (1971).

national venture. As Mandel's invitation demonstrates, individuals of differing world views have learned the ways of cooperation where governments have thus far failed. Nothing is served—least of all our standing in the international community—by Mandel's exclusion. In blocking his admission, the Government has departed from the basic traditions of our country, its fearless acceptance of free discussion. By now deferring to the Executive, this Court departs from its own best role as the guardian of individual liberty in the face of governmental overreaching. Principles of judicial restraint designed to allow the political branches to protect national security have no place in this case. Dr. Mandel should be permitted to make his brief visit.

I dissent.