Jerzy **PANAS**, Genowefa Jankowska, Boleslaw Rzepczyk, Jozefa Michalska, Ryszard Narewski, individually; and on behalf of all others similarly situated, Plaintiffs,

v.

Janet **RENO**, Attorney General of the United States; Doris Meissner, Commissioner of the United States Immigration and Naturalization Service; Edward J. McElroy, District Director of the New York District Office of the Immigration and Naturalization Service, Defendants.

No. 99 Civ. 12421(MBM).

United States District Court, S.D. New York.

Sept. 27, 2000.

Przemyslaw Jan Bloch, Ridgewood, NY, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York, F. James Loprest, Assistant United States Attorney, New York City, for Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs seek to litigate whether a regulation which creates a rebuttable presumption in immigration proceedings that nationals of certain countries, who reside in the United States, would suffer extreme hardship if deported to those countries, denies due process and equal protection of the laws to nationals of another country who argue that they too qualify for that presumed showing but are not the beneficiaries of the presumption. The six named plaintiffs are Polish nationals seeking asylum in this country. (Cmplt. ¶ 8) They seek to represent themselves and a class of others similarly situated in a challenge to the regulation in question, 8 C.F.R. § 240.64(d)(1) (2000), which grants the presumption to Guatemalan and Salvadoran nationals. Plaintiffs request a declaration that the regulation denies them due process and equal protection of the laws, and an injunction conferring the benefit of the presumption on them and members of the class they seek to represent. Jurisdiction is based on 28 U.S.C. § 1343(a)(3) (1994), which gives district courts original jurisdiction in actions to redress denial of Constitutionally guaranteed rights under color of law, and 42 U.S.C. § 1983 (1994), which authorizes suits based on such denial.

The case is before the court on cross-motions by the parties. Plaintiffs move for class certification and a preliminary injunction. Defendants—the Attorney General who promulgated the challenged regulation, and the Commissioner and the District Director of the Immigration and Naturalization Service ("INS") who are charged to apply it—move to dismiss for lack of subject matter jurisdiction because the issue is not ripe, and for failure of the complaint to state a claim upon which relief could be granted.

For the reasons set forth below, defendants' motion to dismiss is granted; plaintiffs' motions are denied as moot.

## I.

### A. The Regulation

The regulation plaintiffs challenge was enacted against an intricate background of litigation and legislation going back more than 15 years. The litigation includes a case brought in 1985 by the American Baptist Churches in the U.S.A., challenging government policy toward religious workers who sought to help Central Americans seeking asylum in the United States, and toward the asylum seekers themselves. The case was settled in 1991. *See American Baptist Churches v. Thornburgh*, 760 F.Supp. 796, 797–811 (N.D.Cal. 1991) (the *"ABC* litigation"). The plaintiffs in the *ABC* litigation had alleged that the United States government "had politicized its asylum policy by discriminatorily denying refugee status to persons fleeing repressive regimes supported by the United States." *Blanco v. INS*, 68 F.3d 642, 645 (2d Cir.1995). The settlement included a stipulation "that the INS would give *de novo*, unappealable hearings (conducted before specially-trained asylum officers ... ) to most Salvadoran and Guatemalan asylum applicants who were present in the United States as of September 19, 1990 (Salvadorans), or October 1, 1990 (Guatemalans)." *Id.*

The legislative background includes two statutes that altered the terms on which certain aliens could avoid deportation. The first of these statutes, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), revised the procedures under the Immigration and Nationality Act ("INA") by consolidating the INA's "exclusion" and "deportation" proceedings into one form of proceeding— "removal"—for aliens who had been the subject of INS proceedings started on or

after April 1, 1997, and replacing the discretionary relief previously provided through "suspension of deportation," 8 U.S.C. § 1254(a) (1994), with "cancellation of removal and adjustment of status for certain nonpermanent residents," 8 U.S.C. § 1229(b) (Supp. IV 1998).

The old procedure had permitted the Attorney General, in her discretion, to suspend the deportation of a person who had been continuously present in this country for seven years, was of good moral character, and had shown that deportation would cause "extreme hardship" to him or to his parent, spouse or child who was a United States citizen or lawful permanent resident alien. 8 U.S.C. § 1254(a)(1). Under the new removal procedure, however, the period of continuous presence was lengthened to ten years, and ceased on the date the alien either was served with an INS charging document that began removal proceedings, or committed an act that made him inadmissible or removable. 8 U.S.C. § 1229(b)(1)(D). The new provision was interpreted to apply to aliens who were the subject of removal proceedings even before the statute's enactment. *See In re N.J.B.*, No.A28 626 831, 1999 WL 1390344, at *8–9 (Dep't Justice Aug. 20, 1999). Further, under the new procedure, the alien would be required to show that deportation would cause "exceptional and extremely unusual hardship" to a spouse, parent or child who was a citizen or lawful permanent resident, and the number of aliens who could qualify was limited to 4000 per year. *See* 8 U.S.C. §§ 1229b(d)(1) and (e)(1), 1182(a)(2), 1227(a)(2) and 237(a)(4) (Supp. IV 1998).

The second statute was the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA"), which, to the extent relevant here, amended the IIRIRA to adopt the holding in *In re N.J.B.,* but also exempted several groups of aliens from its rigors by applying to them the more lenient pre-IIRIRA practice of counting the period of lawful residence to include even the period after service of an INS charging document, and permitting even aliens who had not been the subject of removal proceedings to apply for cancellation of removal under much the same terms that had governed suspension of deportation under the INA. These groups included qualified Salvadorans, Guatemalans, and nationals of former Soviet bloc countries. *See* NACARA, 8 U.S.C. § 1101(a)(43) (1994 and Supp. IV 1998).

NACARA was anticipated to affect large numbers of aliens, with the INS projecting 100,000 applications per year. *See* 63 Fed. Reg. 64,895, 64,906–07 (1998). The Justice Department, explaining the background of the regulation at issue in this case, noted that "certain factors routinely noted in evaluations of extreme hardship may serve as strong predictors of the likelihood of extreme hardship in a given case," and found those factors in the similar immigration history of *ABC* litigation class members, Salvadorans and Guatemalans. The Department found that those three categories of NACARA-eligible aliens shared "general predictors" of extreme hardship. However, the Department declined to adopt a *conclusive* presumption, noting "the necessity of a case-by-case evaluation...." 64 Fed.Reg. 27,856, 27,865 (1999).

Instead, in order to promote "greater administrative efficiency" in processing the expected high volume of cases, *id.,* the Attorney General promulgated the interim regulation at issue here, which creates a *rebuttable* presumption of extreme hardship for *ABC* litigation class members, and other qualifying Salvadorans and Guatemalans. *See* 8 C.F.R. § 240.64(d)(1). The regulation provides that Salvadorans and Guatemalans with long-pending applications for asylum, and members of the plaintiff class in the *ABC* litigation who file applications, "shall be presumed to have demonstrated that deportation or removal from the United States would result in extreme hardship to the applicant or to his or her spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." *Id.* That presumption "shall be

rebutted if the evidence in the record establishes that it is more likely than not that neither the applicant nor a qualified relative would suffer extreme hardship if the applicant were deported or removed from the United States." Id. § 240.64(d)(2).

## B. Plaintiffs

Plaintiffs allege broadly that they "are in different stages of applying for NACARA relief." (Cmplt.¶ 9) The government has submitted documents from plaintiffs' immigration files, and plaintiffs have submitted a letter from their attorney, see *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998) (noting rule that when subject matter jurisdiction is challenged, " 'the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits' ") (quoting *Antares Aircraft v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir.1991)), which show the following with respect to each plaintiff: Plaintiff Jerzy Panas is scheduled for a hearing on his reopened deportation proceeding on November 11, 2000. (Loprest Decl. "Panas" Tab p. 1) Plaintiff Genowefa Jankowska states through her attorney that she has sought to file a stand-alone application under NACARA for suspension of deportation, but has been unable to do so because the INS has no record of her. (Pl.Mem. Exh. C) Plaintiff Boleslaw Rzepczyk has filed an application for suspension of deportation following a notice of the INS's intent to deny his request for asylum on a claim that he would be persecuted in Poland because of his political views. That notice, dated September 19, 1997, noted that the force of his application had been weakened by his visit to Poland in 1992. (Loprest Decl. "Rzepczyk" Tab p. 9) Plaintiff Jozefa Michalska was due to be heard on May 17, 2000 on her application to apply for suspension of deportation, but asked this court to stay that proceeding on the ground that if she prevailed, her claim in this case would be mooted. The government agreed to stay her hearing, without the court's direct intervention. Plaintiff

Ryszard Narewski filed in September 1998 a pending application for suspension of deportation, after having been charged with illegal entry and having agreed to depart voluntarily in lieu of deportation. (Loprest Decl. "Narewski" Tab pp. 1, 18, 23)

## II.

### A. Due Process

■ "Article III, § 2 of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.' " *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The result of that is the concept of standing, which is required of anyone who would invoke federal jurisdiction:

> The 'irreducible constitutional minimum of standing' contains three requirements. First and foremost, there must be alleged (and ultimately proven) an 'injury in fact'—a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent', not "conjectural" or "hypothetical." Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

*Id.* at 102–03, 118 S.Ct. 1003 (internal citations omitted). What is complained of in this lawsuit fails each of those tests, at least insofar as plaintiffs allege a due process violation.

First, the alleged injury is neither " 'concrete' " nor " 'actual' " nor " 'imminent.' " All of the named plaintiffs are still engaged in the administrative process of challenging their possible deportation.

Thus, it is still possible that any of them, or any member of the proposed class, will still be able to establish extreme hardship even without the benefit of a rebuttable presumption. Therefore, the harm plaintiffs attribute to the absence of the presumption is both "conjectural" and "hypothetical."

Second, and related, even if plaintiffs were entitled to the presumption, it is still possible that any of them could be deported if the INS produced enough proof to rebut the presumption. Therefore, whatever harm plaintiffs eventually might suffer, it would not necessarily be "traceable" to the unavailability of the presumption to them.

Finally, for the above reasons, it is not now clear that any harm would be redressed by granting plaintiffs the relief they seek. If the INS has enough proof available to rebut the presumption of extreme hardship, then making the presumption available to them will not redress their injury.

Moreover, plaintiffs seek only to have a presumption of extreme hardship that is available to Salvadorans and Guatemalans made available to them; they do not and cannot claim any *a priori* entitlement to the presumption. It is only the availability of the presumption to others that occasions their complaint, but that availability itself causes them no harm. In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), the plaintiffs attempted a facial challenge to regulations that defined eligibility for a statutorily created amnesty program for illegal immigrants. The Court rejected that challenge as not ripe for decision, noting that the regulations "impose no penalties for violating any newly imposed restriction," but rather "limit access to a benefit created by [the statute] but not automatically bestowed on eligible aliens." *Id.* at 58, 113 S.Ct. 2485. The Court held that a class member's claim "would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Id.* at 59,

113 S.Ct. 2485. If anything, the regulation at issue here is even less ripe for challenge because it would not limit a class member's access to relief if in fact he could show that he or other protected persons within his immediate family would suffer extreme hardship from his deportation.

Plaintiffs suggest in their reply papers that the class may include persons who, "upon hearing the news of so clear a discrimination [between those favored by the presumption and others], were chilled from even applying for their NACARA benefits." (Pl. Reply Mem. at 10) Plainly, none of the named plaintiffs is so situated, all having applied in one fashion or another to block removal. Nor has counsel identified any such person, and the phenomenon itself—being deterred from even applying to bar removal by the news that there is a rebuttable presumption that helps others—seems counter-intuitive. Further, assuming that a person who actually claimed to have experienced such a chill could be found, it seems doubtful that that claim would confer standing. The regulation in question threatens no harm to, and imposes no obligation or burden on, any potential plaintiff in this case. Like the customers of the respondent and would-be plaintiff in *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999), who sought access to arrest records in the possession of the petitioner police department, the potential plaintiffs here "may seek access under the statute on their own ... without incurring any burden other than the prospect that their request will be denied." 120 S.Ct. at 489. That was not enough to support a facial challenge to the regulation at issue there, and it is not enough here either, at least insofar as plaintiffs allege a due process violation.

Whether the flaw in plaintiffs' due process claim is analyzed as a lack of standing or a lack of ripeness, it seems clear that the bedrock Article III requirement that there be a case or controversy over which

to exercise subject matter jurisdiction is lacking here. The government has pointed to other flaws in plaintiffs' due process allegations, and argued that, even assuming subject matter jurisdiction, they fail to state a claim. However, for a court to treat such arguments after it has found no subject matter jurisdiction "is, by very definition, for a court to act ultra vires." *Steel Co., supra,* 523 U.S. at 102, 118 S.Ct. 1003.

## B. Equal Protection

 Although the Fifth Amendment, unlike the Fourteenth, contains no language guaranteeing equal protection of the laws, "there is a well-established equal protection component to the Fifth Amendment Due Process Clause applicable to the federal government." *Skelly v. I.N.S.,* 168 F.3d 88, 91 (2d Cir.1999). In this case, the challenged regulation does not disadvantage plaintiffs directly in obtaining the benefit of avoiding deportation because there is no limitation on the amount of the benefit available—*i.e.,* the number of aliens who may avoid deportation by showing extreme hardship. However, the regulation does make it easier for others to obtain that benefit, and it is at least arguable that denying plaintiffs that same advantage constitutes a denial of equal treatment. *See Northeastern Fla. Chapter of the Assoc. Gen'l. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (holding that plaintiffs' inability to compete equally for contracts is a sufficient "injury in fact" to challenge minority set-aside program, and that plaintiffs need not also allege inability to win the contract). Thus, it is necessary to address the substance of plaintiffs' equal protection claim. However, that claim fails, principally because it is directed at an immigration regulation.

The Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 791, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)). So long as there is a "facially legitimate and bona fide" reason for the exercise of executive discretion, the courts will neither look behind it nor subject it to any constitutional test. *Kleindienst v. Mandel,* 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). The greater administrative efficiency to be gained in dealing with the large number of applicants anticipated to be generated by the *ABC* litigation, *see* p. 5, *supra,* is such a legitimate and bona fide reason.

\* \* \* \* \* \*

For the above reasons, defendants' motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state an equal protection claim is granted. Plaintiffs' motions are denied as moot.