**Mamadou Saliou DIALLO
and Mariama Diallo,
Plaintiffs,**

v.

**Janet RENO, as Attorney General of the United States; Doris Meissner, as Commissioner of the Immigration and Naturalization Service; Thomas P. Fischer, District Director of the Immigration and naturalization Service; Dwight Faulkner, Assistant District Director, Examinations Section, Defendants.**

No. 1:99–CV–378–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 29, 1999.

## ORDER

MOYE, District Judge.

The above-styled action is before the court on 1) defendants' motion to dismiss or in the alternative motion for summary judgment [# 8]; and 2) plaintiffs' motion to stay removal proceedings [# 2].

## FACTS

Plaintiffs, Mamadou Saliou Diallo and Mariama Diallo, were admitted to the United States on approximately October 31, 1995 as nonimmigrant visitors with authorization to remain in the United States until January 30, 1996.[1] (Faulkner Declaration, ¶ 3). On approximately July 18, 1996, Mr. Diallo was notified of his selection pursuant to the Fiscal Year 1997 ("FY 97") Diversity Immigrant Visa Program.[2] (Defendants' Exhibit 1). The Diversity Immigrant Visa Program was created to allow a certain limited number of diversity immigrant visas to be issued to individuals from countries that have had low rates of immigration into the United States. 8 U.S.C. § 1153(c); 22 C.F.R. § 42.33. In FY 97, Guinea, Mr. Diallo's country of birth, was granted 337 of the 55,000 possible visas to be issued under the program. (Faulkner Declaration, ¶ 5).

Notification of selection in the Diversity Immigrant Visa Program does not automatically guarantee receipt of a visa even if the applicant is fully qualified to receive a visa. See 61 Fed.Reg. 58730. Indeed, approximately twice as many applicants for diversity visas are notified each year as there are available visas. (Faulkner Declaration, ¶¶ 4 and 5). Mr. Diallo was advised of this fact when he received his notice of selection.[3] (Defendants' Exhibit 1).

H. Glenn Fogle, Jr., Office of H. Glenn Fogle, Jr., Atlanta, GA, for plaintiffs.

Julia B. Anderson, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, for Defendants.

1. Apparently, Mr. Diallo entered the United States for the first time in 1991 without inspection from Canada into New York. (Diallo Aff. ¶ 3).

2. Mrs. Diallo, as the wife of a "selectee", would also have become eligible for a visa if her husband's application to adjust status had been approved. 8 U.S.C. § 1153(d).

3. Plaintiffs explain that, each year, the Immigration and Naturalization Service ("INS") issues notices with instructions for the Diversity Immigrant Visa Program for that fiscal year. The instructions require the mailing of an application to a specified address within a one-month period. The INS then randomly selects 100,000 applications (for FY 97) out of the several million applications (6.5 million

Once an alien receives notice of his selection in the Diversity Visa Immigrant Program, he is then eligible to apply for an adjustment to permanent resident status pursuant to 8 U.S.C. § 1255. On November 25, 1996, Mr. Diallo applied for an adjustment of status. (Defendants' Exhibit 1). Mr. And Mrs. Diallo each paid the INS the $130.00 filing fee for the adjustment of status application (I–485), plus the $650.00 penalty for being out of status when filing (I–485A), plus the $70.00 fee for the employment authorization application (I–765), the total for each being $850.00. (Plaintiffs' Exhibit B).

On January 21, 1997, Mr. Diallo's brother, Abdourahmane Diallo died in Grady Memorial Hospital in Atlanta, Georgia from a severe asthma attack. (Diallo Aff., Exhibit A). On January 29, 1997, Mr. and Mrs. Diallo went to the Atlanta District Office with his brother's death certificate to apply for permission to leave the United States ("Advance Parole") and take his brother's body back to Africa. While Mr. and Mrs. Diallo were filing their applications for Advance Parole with one of the information officers, the INS arrested Mr. Diallo and took him into custody because the INS records indicated an outstanding deportation order for a Mamadou Diallo also from Guinea. (Id). Applications for Advance Parole require a background investigation of the INS records and criminal records to assure that the applicant is in fact eligible to return to the United States.

Mr. Diallo was taken to the Deportation division of the Atlanta INS Office for further investigation. He was questioned as to whether he was Mamadou Mouctar Diallo (though his passport indicated otherwise) and he told the officers that he was Mamadou Saliou Diallo, not Mamadou Mouctar Diallo. (Id). The officers did not

believe Mr. Diallo and showed him a computer screen with the names of Mamadou Mouctar Diallo's parents and his birth date. They questioned Mr. Diallo regarding whether these people were his parents and whether this was his date of birth. Mr. Diallo answered in the negative. The INS Deportation officers still did not believe Mr. Diallo, took his fingerprints and put him in a holding cell. (Id.). After a few hours, Mr. Diallo was let out of the holding cell and informed by the Deportation officers that he was lucky because they had obtained a copy of Mamadou Mouctar Diallo's fingerprints from the INS office in New York. After comparing those fingerprints to Mr. Diallo's, the INS confirmed that Mr. Diallo was not in actuality Mamadou Mouctar Diallo. (Id.).

That same day, the INS approved Mr. and Mrs. Diallo's requests for Advance Parole and their applications were signed by Dwight Faulkner on behalf of Thomas Fischer. (Plaintiffs' Exhibit C and D). Thus, plaintiffs point out that, on January 29, 1998, the INS had full and complete knowledge that Mr. Diallo was not the same person as Mamadou Mouctar Diallo and had confirmed it to their own satisfaction by arresting him for several hours and making a fingerprint comparison.

Prior to approving Mr. Diallo's application for a diversity immigrant visa, the INS was required to conduct a complete background investigation, including an FBI fingerprint check, a CIA name check, and a records check through the Bureau of Consular Affairs in Guinea, Mr. Diallo's native country. (Faulkner Declaration, ¶¶ 8, 11). As part of the application process, Mr. Diallo was also required to appear for an interview, which was conducted on May 7, 1997. (Faulkner Declaration, ¶ 9). Plaintiffs point out that the back-

for FY 97) it receives. Apparently, the INS selects approximately twice as many applicants as there are visas available because it has discovered over the years that usually a little more than half of the selectees will actually file or are actually qualified to receive a visa in the first place. Plaintiffs point out

that, though in theory, being selected in the Diversity Immigrant Visa Program only means a 50% chance of visa issuance, in actuality, the chances for qualified selectees who timely file early in the fiscal year and are interviewed when there are visa numbers available are actually 100%.

ground investigation is usually completed before the interview is scheduled.

Prior to Mr. Diallo's interview on May 7, 1997, the INS had located records on a Mamadou Mouctar Diallo, also born in Guinea, who had been ordered deported in 1995. (Faulkner Declaration, ¶ 9). Defendants failed to recall or discover the fingerprint comparisons conducted on January 29, 1997. Based on Mr. Diallo's interview,[4] the INS was unable to confirm that Mamadou Saliou Diallo and Mamadou Mouctar Diallo were in fact two different people. (Id.). This necessitated a further investigation before it could approve Mr. Diallo's application for adjustment of status. Upon investigation, the INS concluded that Mr. Diallo was the same Mamadou Diallo who had been ordered deported and on November 26, 1997, the INS issued a decision denying Mr. Diallo's application for adjustment of status based on that assumption. (Faulkner Declaration, ¶ 13; Defendants' Exhibit 2). The INS has since determined that it was incorrect in its conclusion that Mamadou Saliou Diallo and Mamadou Mouctar Diallo are one and the same person. (Faulkner Declaration, ¶ 16).

Defendants assert that a copy of the District Director's November 26, 1997 decision was mailed to Mr. Diallo and to his attorney, Glenn Fogle. (Faulkner Declaration, ¶ 16). According to the INS records, neither of these letters were returned as undeliverable. (Faulkner Declaration, ¶ 13). The only written record the INS has of any inquiry by plaintiffs or their attorney following the District Director's November 26, 1997 decision denying Mr. Diallo's application for adjustment of status is a letter dated May 14, 1998, from Glenn Fogle addressed to District Counsel Terry Bird. (Defendants' Exhibit 3). Further, the INS records do not reflect any contact by Mr. Diallo or his attorney with the INS between the date of Mr. Diallo's interview on May 7, 1997 and September 30, 1997, the date

Mr. Diallo's eligibility for a FY 97 Diversity Visa expired. (Faulkner Declaration, ¶¶ 12–14).

In opposition, plaintiffs assert that the November 26, 1997 decision was not mailed out to Mr. Diallo and his attorney until his attorney met with Mr. Faulkner and Mildred Ellis in early April, 1998. Plaintiffs point out that Ellis, after locating plaintiffs' files, remarked to plaintiffs' counsel that the decision and copy to counsel (which are to be sent via certified mail) were still in the file and had not been sent. It was not until that time that Mr. Diallo or his counsel were even made aware of the INS's decision which prompted the letter of May 14, 1998 from Mr. Diallo's counsel to the INS District Counsel. (Defendants' Exhibit 3).

Entitlement to immigrant status in the Diversity Immigrant Visa Program lasts only through the end of the fiscal year for which the applicant is selected, which ends September 30. (Faulkner Declaration, ¶ 6). After that date, no diversity immigrant visas can be issued for that fiscal year. (Faulkner Declaration, ¶ 6). See also 22 C.F.R. § 42.33. Therefore, even if Mr. Diallo or his attorney had contacted the INS immediately after the November 26, 1997 denial of Mr. Diallo's application for adjustment in status, the outcome would have been the same since the last day any visas could be issued under the 1997 Diversity Immigrant Visa Program was September 30, 1997. (Faulkner Declaration, ¶ 6).

On January 10, 1998, the INS issued a Notice to Appear for removal hearing to Mariama Diallo, apparently based on the assumption that she was the wife of Mamadou Mouctar Diallo, who had been ordered deported. However, the Notice to Appear was issued in error before the INS discovered its mistake regarding Mr. Diallo's identity. Plaintiffs state that they did not receive the Notice to Appear dated November 24, 1997 until April 1998.

4. Plaintiffs point out that, during his interview, he was not asked any questions relating

to Mamadou Mouctar Diallo. (Plaintiffs' Exhibit A).

(Diallo Aff., Exhibit 1). The Notice to Appear was never filed with the Immigration Court and therefore removal proceedings have never been formally commenced against Mrs. Diallo. 8 C.F.R. § 3.14(a). (Faulkner Declaration, ¶ 15).

Plaintiffs are currently deportable pursuant to 8 U.S.C. § 1227(a)(1)(C) based upon the fact that they have remained in the United States illegally since January 30, 1996. (Faulkner Declaration, ¶ 3).

On February 9, 1999, plaintiffs filed a complaint for Writ of Mandamus seeking to compel defendants to grant Mamadou Diallo's application for adjustment of status to lawful permanent residency.

### LEGAL DISCUSSION

#### I. MOTION TO DISMISS OR FOR SUMMARY JUDGMENT.

"In appraising the sufficiency of the complaint ... the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). See also Linder v. Portocarrero, 963 F.2d 332 (11th Cir.1992). The court must accept the facts pleaded in the complaint as true and construe them in a light favorable to Petitioner. Quality Foods v. Latin American Agribusiness Development Corp., 711 F.2d 989, 994–95 (11th Cir.1983).

Defendants move to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) on the ground that this court lacks jurisdiction. In opposition, plaintiffs assert that the court does have jurisdiction for Writ of Mandamus based on the alleged affirmative misconduct of the INS in denying plaintiffs' immigrant visas for the false reason that Mr. Diallo had an outstanding order of deportation against him when the INS already knew otherwise. Plaintiffs argue that this affirmative misconduct amounts to a fundamental miscarriage of justice which requires the court's redress and confers the court with jurisdiction.

█ It is well settled that the judiciary will not interfere with the visa-issuing process. Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1181 (2nd Cir.1978); Rahman v. McElroy, 884 F.Supp. 782, 785 (S.D.N.Y. 1995). The Supreme Court in Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), held:

> The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

Id. at 766, 92 S.Ct. 2576.

█ Plaintiffs first assert that this court has jurisdiction to review the District Director's decision denying Mr. Diallo's application for adjustment in status pursuant to 8 U.S.C. § 1329. That statute, as recently amended by the Illegal Immigration Reform and Immigrant Responsibility Act (the "IIRIRA"), provides in pertinent part:

> The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this subchapter.... Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.

See also Reno v. American–Arab Anti–Discrimination Committee, 525 U.S. 471, ——, n. 4, 119 S.Ct. 936, 940, n. 4, 142 L.Ed.2d 940 (1999). Hence, 8 U.S.C. § 1329 does not provide jurisdiction for suits brought by private individuals against the United States.

█ 8 U.S.C. § 1252(a)(2)(B)(i) provides in pertinent part:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law, no court shall have jurisdiction to review—

(i) any judgment regarding the granting of relief under section . . . 1255 of this title. . . .

8 U.S.C. § 1255 establishes the criteria for granting applications for adjustment of status of nonimmigrants. Thus, 8 U.S.C. 1252(a)(2)(B)(i) precludes judicial review of a § 1255 denial of adjustment of status. *Rahman*, 884 F.Supp. at 785; *Zheng v. McElroy*, 1998 WL 702318 at *3, 5 (S.D.N.Y.1998) (holding that "[t]he court is unaware of any basis upon which it could entertain jurisdiction over a Section 1255 denial of adjustment status."). *See also* 8 C.F.R. § 245.2(a)(5)(ii).

■■■ 8 U.S.C. § 1252(b)(9) provides for judicial review of all issues relating to a proposed removal of an alien. This would include any pending application for adjustment of status. 8 C.F.R. § 245.2(a)(5)(ii). An alien whose application for adjustment of status has been denied may reapply for adjustment of status during removal proceedings. Id. If the Immigration Judge denies that relief, the alien can appeal to the Board of Immigration Appeals and, ultimately, may seek judicial review in the Court of Appeals.[5] An alien must exhaust his administrative remedies before seeking judicial review of a denial of an application for adjustment of status. *Rahman*, 884 F.Supp. at 785; *Zheng*, 1998 WL 702318 at *5. This is consistent with the intent of the IIRIRA amendments to the Immigration and Nationality Act (the "INA"), which was to provide for judicial review one time and in one place on all issues relating to an alien's proposed removal. *See Richardson v. Reno*, 162 F.3d 1338, 1345 (11th Cir. 1998). This principle of channeling judicial review of all questions of law and facts arising from removal proceedings into one

judicial review in one court was most recently reaffirmed by the Supreme Court in *American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940.

■■■ The District Director's denial of Mr. Diallo's application for adjustment of status is also not subject to judicial review under the Administrative Procedure Act (the "APA"). 5 U.S.C. § 704 provides in pertinent part:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

The District Director's decision is: 1) not made reviewable by statute and 2) not a final agency action. *See* 8 U.S.C. § 1252(a)(2)(B)(i); 8 C.F.R. § 245.2(a)(5)(ii). In *Rahman*, the court held that the INS's decision regarding an application for adjustment of status is not subject to appeal under the APA. *Id.* at 787 (citing *Wan Shih Hsieh*, 569 F.2d at 1182).

■■■ Finally, this court lacks jurisdiction under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

Mandamus jurisdiction is precluded by 8 U.S.C. § 1252(a)(2)(B)(i), as set forth above, which provides that no court may exercise jurisdiction over a claim relating to a final order of removal except as provided by the INA, "notwithstanding any other provision of law." *See Richardson*,

---

5. The constitution does not guarantee aliens the right to judicial review of deportation orders. *Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547 (1952). In *Carlson*, the Supreme court held that restricting federal court jurisdiction to review immigration decisions does not violate the Due Process Clause:

> The power to expel aliens, being essentially a power of the political branches of govern-

ment, the legislative and executive, may be exercised entirely through executive officers, with such opportunity for judicial review of their action as Congress may see fit to authorize or permit.

*Id.* at 537, 72 S.Ct. 525 (internal quotations omitted). In other words, judicial review of deportation orders is limited to that review provided by Congress.

**1368**

162 F.3d at 1357 (holding that the INA's "broad admonition that it applies 'notwithstanding any other provision of law' sufficiently and clearly encompasses other provisions of law."). Neither mandamus jurisdiction nor federal question jurisdiction appears to have been contemplated by the INA as an independent ground conferring jurisdiction. *See e.g., Rusu v. Reno,* 999 F.Supp. 1204, 1210 (N.D.Ill. 1998) (holding that the INA precluded the court's jurisdiction under 28 U.S.C. § 1651 (All Writs Act) to hear collateral due process and equal protection challenges to the final deportation order, commenting that "only through a contorted reading of the provision could a court conclude that 'any other provision of law' does not include ... jurisdiction pursuant to ... § 1651"); *Asare v. Ferro,* 999 F.Supp. 657, 659 (D.Md.1998) (denying a plaintiff's request for a temporary restraining order seeking to enjoin INS from executing a deportation order, concluding that "petitioners may not circumvent the obvious intent of the IIRIRA to limit federal court jurisdiction over deportation proceedings and injunctive relief requests.").

 Even if mandamus jurisdiction is not precluded by the provisions of the INA, plaintiffs have failed to present any facts that would support this court's invocation of mandamus jurisdiction in this case. "Mandamus is available only when the plaintiff has a clear right to relief, the defendant has a clear, ministerial duty to act, and no other adequate remedy is available." *Greater Los Angeles Council on Deafness v. Baldrige,* 827 F.2d 1353, 1362 (9th Cir.1987). *See Meadows v. U.S. Marshal, Northern Dist. Of Ga.,* 434 F.2d 1007, 1008 (5th Cir.1970) (holding that "[m]andamus relief is proper only where the duty owed is clear."); *cert. denied,* 401 U.S. 1014, 91 S.Ct. 1265, 28 L.Ed.2d 551 (1971); *Banks v. Secretary of Indiana Family and Social Services Admin.,* 997 F.2d 231, 244 (7th Cir.1993) (holding that "[a] party seeking a writ of mandamus shoulders the burden of showing that a right to relief is clear and indisputable."). In the instant case, plaintiffs have not shown that the immigration laws create the necessary right or duty.

 Clearly, there was no guarantee that either of plaintiffs would receive a visa based solely upon the fact that Mr. Diallo was selected to be in the Diversity Immigrant Visa Program. Mr. Diallo was so advised. Mr. Diallo's eligibility for a diversity visa expired on September 30, 1997, which was the last day the State Department could issue any diversity visas. (Faulkner Declaration, ¶ 6; 22 C.F.R. § 42.33(e)). There is no requirement that the INS issue a decision on an application for adjustment of status before that deadline. Defendants submit that the volume of cases investigated by the INS each year would make compliance with any such deadline impossible. "[A]n alien's filing of a visa petition ... does not guarantee that a visa will be issued, nor does it grant the alien beneficiary any right to enter or remain in the United States." *Rahman,* 884 F.Supp. at 784. *See also Elkins v. Moreno,* 435 U.S. 647, 667, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) ("adjustment of status is a matter of grace, not right.").

 Further, the courts have consistently held that the mandamus statute does not apply to discretionary acts. *Zheng,* 1998 WL 702318 at *3; *Rahman,* 884 F.Supp. at 787 (quoting *Wan Shih Hsieh,* 569 F.2d at 1182). The decision of how to handle and investigate Mr. Diallo's application for adjustment of status and the District Director's denial of that application are clearly discretionary acts. 8 U.S.C. § 1252(a)(2)(B)(i) specifically defines the District Director's decision on a § 1255 application for adjustment of status as a discretionary act. "[T]he power to make someone a citizen [or permanent legal resident] of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers." *INS v. Pangilinan,* 486 U.S. 875, 883–84, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). *See also Miller v. Albright,* 523

U.S. 420, 118 S.Ct. 1428, 1447, 140 L.Ed.2d 575 (1998).

 In opposition, plaintiffs contend that the INS had a clear duty to process the visas of these qualified applicants to the extent that the visas were available. In support, plaintiffs refer to the court in *Galvez v. Howerton*, 503 F.Supp. 35 (C.D.Cal., 1980), which held:

> The INS has a statutory obligation to issue visas to qualified applicants to the full extent of the annual quota limits established by congress. The legislative history ... indicates that this duty has not been left to agency discretion ... but is obligatory on the agency.

*Id.* at 38–39 (citations omitted). However, this case is plainly distinguishable from *Galvez* because the visas involved in *Galvez* were "Fifth Preference" immigrant visas under 8 U.S.C. § 1153(a), not diversity visas under 8 U.S.C. § 1153(c), which are involved in this case. 8 U.S.C. § 1153(a) deals with preference allocation for family-sponsored immigrants. This distinction is significant because 8 U.S.C. § 1153(e), which sets forth the order of consideration of the visa applications, expressly distinguishes these two types of visas:

> (1) Immigrant visas made available under subsection (a) or (b) of this section shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General ...
>
> (2) Immigrant visa numbers made available under subsection (c) of this section (relating to diversity immigrants) shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved.

Accordingly, in *Galvez*, the INS had a clear statutory duty to process and issue the family-sponsored visas in a certain order. To the contrary, however, 8 U.S.C. § 1153(e)(2) allowed the INS in this case to process and issue the diversity visas in

any order it established.[6] As the court in *Rahman* held, the INS does not have a duty to schedule the appointments of diversity visa selectees who apply for adjustment of status in any particular order so that their chances for visa issuance would be increased. *Id.* at 884 F.Supp. at 788. Even assuming that the INS already knew Mr. Diallo was not Mamadou Mouctar Diallo on the day of Mr. Diallo's interview and the diversity visas were available on that day, the court is not aware of, and neither of the parties have set forth, any requirement that the INS had to issue a decision on the application for adjustment immediately after the interview.

 In further opposition, plaintiffs allege that, because the INS on January 29, 1997 had full knowledge that Mr. Diallo was not Mamadou Mouctar Diallo through fingerprint verification, the INS's assertion that it had to conduct a further investigation into whether Mr. Diallo was Mamadou Mouctar Diallo on May 7, 1997 is totally false. Plaintiffs contend that this constituted affirmative misconduct on behalf of the INS which caused the denial of plaintiffs' visas, and hence, the INS may be estopped from denying an application for adjustment. It is true that the courts have held that the INS may be estopped from denying a visa if it engaged in affirmative misconduct and the visa applicant was denied as a result of the affirmative misconduct. *See Galvez v. Howerton*, 503 F.Supp. 35 (C.D.Cal. 1980); *Saywack v. Attorney General of U.S.*, 1993 WL 205121 (S.D.N.Y., 1993); *Reid v. INS*, 1993 WL 267278 (S.D.N.Y.1993); *Reid v. INS*, 897 F.Supp. 798 (S.D.N.Y.1995); *Marcetic v. INS*, 1998 WL 173129 (N.D.Ill.1998).

Defendants admit that the INS and its employees erred in concluding that Mr. Diallo was the same person as Mamadou Mouctar Diallo. Defendants further admit that the INS employee who investigated plaintiffs' application for adjustment

---

**6.** The court notes that the Diversity Immigrant Visa Program is commonly referred to as the "visa lottery".

should have discovered before the interview that the INS had already determined that Mr. Diallo was not the same person as Mamadou Mouctar Diallo. However, there is no evidence or, for that matter, allegation that the INS employee in fact knew that Mr. Diallo was not the same individual who was to be deported. Defendants submit that, if that INS employee had known, he would not have requested further information regarding the identity of Mr. Diallo and Mamadou Mouctar Diallo. The record in this case shows that on the day after plaintiffs' interviews, the INS requested the service file on Mamadou Mouctar Diallo to determine whether Mr. Diallo had previously been ordered deported. (Faulkner Declaration, ¶ 10). On July 10, 1997, the Atlanta office again requested the file through a memorandum to the New York Detention and Deportation Unit. On July 14, 1997, the Atlanta Office received a copy of the Immigration Court's decision in the deportation proceeding in the matter of Mamadou Mouctar Diallo. (Id.).

Indeed, it would have been an abrogation of the INS employee's duty not to determine whether the two Diallos were one and the same person. (Faulkner Declaration, ¶ 11). It is not unheard of for aliens who are seeking adjustment of status to falsify their application regarding whether they had been ordered deported. (Faulkner Declaration, ¶ 11). *See also Vakalala v. Schiltgen,* 1997 WL 102501 (N.D.Cal.1997) (where the INS discovered that a husband and wife who had applied for adjustment of status had lied on their applications and failed to disclose that they were under final orders of deportation).

▮▮▮ These facts show that what occurred was a mistake. Even if the INS made the same mistake twice and was negligent, mere negligence does not amount to affirmative misconduct. *See e.g., INS v. Miranda,* 459 U.S. 14, 18, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Fano v. O'Neill,* 806 F.2d 1262, 1265 (5th Cir.1987) (holding that "to state a cause of action for estoppel against the government, a private

party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline."). Further, any delay in the investigation does not amount to affirmative misconduct. *See e.g., Miranda,* 459 U.S. at 18, 103 S.Ct. 281.

▮▮▮ "Affirmative misconduct" requires an affirmative misrepresentation or affirmative concealment of a material fact by the government. *See, e.g., Linkous v. United States,* 142 F.3d 271, 278 (5th Cir. 1998). The courts have also made clear that affirmative misconduct must be more than mere mistake, mere negligence, or unexplained delay. *See, e.g., Office of Personnel Management v. Richmond,* 496 U.S. 414, 419–20, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (finding no estoppel for mistaken, unauthorized statements of a Government agent); *Miranda,* 459 U.S. at 18, 103 S.Ct. 281 (holding that even if delay in processing application was negligent, estoppel still was not warranted); *Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (holding that Social Security Administration agent's erroneous response to applicant's inquiry and failure to have applicant complete written request, as internal regulations required, were not enough for applicant to succeed on estoppel claim against Government).

In *Galvez,* 503 F.Supp. at 35, the court found that the INS's repeated failure to process an application to adjust status based on the staff's lack of familiarity with its own laws constituted affirmative misconduct. In *Saywack,* 1993 WL 205121, the court found affirmative misconduct where the record disclosed a series of lengthy unexplained delays spanning more than five years. The mistake made by defendants in this case does not rise to the level of those found by either of the courts in *Galvez* or *Saywack.* As defendants point out, their mistake in this case is not entirely unreasonable when considered in light of the fact that the INS is responsible for investigating as many as 100,000 diver-

sity visa applications each year.[7] In addition, there is no evidence in this case that plaintiffs did anything to follow up on their applications between May 7, 1997, the date of their interviews, and September 30, 1997, which was the last day any diversity visas could be issued. Thus, plaintiffs' own actions, or failure to act, may have contributed to the result in this case. Absent evidence of affirmative misconduct, plaintiffs are not entitled to relief. *See Mendoza–Hernandez v. INS*, 664 F.2d 635, 639 (7th Cir.1981) (*citing INS v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973)).

The two other cases cited by plaintiff are also distinguishable from the case at hand. In *Reid v. INS*, 1993 WL 267278, the INS made a determination that the applicant was entitled to an adjustment of status but then later refused to issue a green card. In *Marcetic*, 1998 WL 173129, the Immigration Judge granted the plaintiff legal permanent residence based on a diversity visa application and ordered that plaintiff be issued all appropriate documents necessary to give effect to his order. As a result of some clerical error either within the INS or the State Department, the visa was no issued prior to the September 30th deadline. The district court ordered the INS to take whatever steps were necessary to complete the plaintiff's adjustment of status. In the case at hand, the INS had determined, erroneously as it turns out, that plaintiffs were not qualified for adjustment of status based on the fact that Mr. Diallo had been ordered deported. (Defendants' Exhibit 2). Unlike *Reid* and *Marcetic*, the INS in this case has never otherwise determined whether plaintiffs were qualified for adjustment of status.

The facts and issue presented in this case are similar to those presented in the case of *Rahman*, 884 F.Supp. at 782. In *Rahman*, six natives of Bangladesh were notified that they had been selected for possible immigrant visas in the Diversity Immigrant Visa Program. *Id.* at 783. They were also notified that only 55,000 visas were available although approximately 110,000 possible applicants had been notified of their selection. *Id.* Upon receipt of the petitioners' applications for adjustment of status, the INS scheduled each of them for an interview. Petitioners alleged that the INS purposely scheduled their interviews later than other applicants so that by the time their interviews were held all diversity visas available to Asian applicants would have been exhausted.

The *Rahman* court granted the government's motion to dismiss and denied the petitioners' request for injunctive relief. The court held that the petitioners could not seek direct review of the decision denying an application for adjustment of status in a district court and that the petitioners were required to exhaust their administrative remedies through removal proceedings before seeking judicial review of the decision denying an application for adjustment of status. *Id.* The court further held that petitioners could not seek judicial review of the denial of their applications for adjustment of status under the APA. *Id.* at 787. Finally, the court held that petitioners could not seek relief under 28 U.S.C. § 1361 because the relief they were requesting from the INS was discretionary and therefore not subject to a writ of mandamus. *Id.*

Similarly, the court hereby holds that this court lacks jurisdiction and therefore, GRANTS defendants' motion to dismiss.

## II. MOTION TO STAY REMOVAL PROCEEDINGS.

In view of the above ruling, the court hereby DENIES this motion as moot.[8]

---

**7.** This does not include the thousands of other applications to adjust status and applications for naturalization processed by the INS each year.

**8.** The court also notes that plaintiffs do not dispute that removal proceedings have not been formally commenced against plaintiffs. Plaintiffs' motion must be denied as moot on this basis also.

## CONCLUSION

In sum, the court hereby 1) GRANTS defendants' motion to dismiss or in the alternative motion for summary judgment [# 8]; and 2) DENIES plaintiffs' motion to stay removal proceedings [# 2] as MOOT.

The Clerk of the court is hereby DIRECTED to CLOSE this case.

SO ORDERED.