BARKETT, Circuit Judge,
dissenting:
I would affirm the district court’s grant of mandamus ordering the Immigration and Naturalization Service (“INS”) to do *917 that which was required of it by Congress: process Nyaga’s application for a diversity immigrant visa. See Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1378 (11th Cir.1998) (en banc) (recognizing that the writ of mandamus is an appropriate remedy to correct the failure to carry out a ministerial task) (citing In re Estelle, 516 F.2d 480, 483 (5th Cir.1975)).[1] The INS takes the position that it is free to completely disregard a Congressional directive. This view is problematic in the abstract, to say the least, but in this case the INS’ stance renders nugatory an entire section of the Immigration and Nationality Act (“INA”). See 8 U.S.C. § 1153(c).
Section 1153(c) of the INA is comprised of three subsections that, together, establish the diversity immigrant visa program. As the majority notes, the diversity visa program is designed to provide permanent residence visas to individuals from countries with historically low rates of immigration to the United States. In the first subsection of § 1153(c), entitled “In General,” Congress details the bulk of the program.[2] See id. In the introductory paragraph to § 1153(c)(1), Congress states that “[ejxcept as provided in paragraph (2), aliens subject to the worldwide level specified in section 1151(e) of this title for diversity immigrants shall be allotted visas each fiscal year as follows.... ” Id. (emphasis added).
Athough the Department of State generally administers the diversity visa program, the INS is responsible for adjudicating and issuing diversity visas to applicants who reside in the United States at the time of their selection. Once an alien receives notice of his selection in the diversity visa program, he is eligible to apply for an adjustment to permanent resident status.[3] See 8 U.S.C. § 1255. To receive a status adjustment, the alien must meet three criteria: 1) the applicant must apply for the adjustment; 2) the applicant must be statutorily eligible for the adjustment; and 3) the INS must have a visa number available when the alien’s application is approved. See § 1255(a). While the ultimate decision whether to adjust an alien’s status is discretionary, diversity visa applicants who are selected to participate in the program (the “lottery winners”) satisfy § 1255(a)’s criteria simply by applying for the adjustment and meeting § 1153(c)’s eligibility requirements. And, as the INS concedes in its brief, an otherwise eligible immigrant[4] *918 who has complied with these requirements would ordinarily face no impediment to a status adjustment, save the possibility that all of the available visas under the diversity program had already been issued to other applicants.
Throughout § 1153(c)(1) Congress chose to employ authoritative language that affirmatively directs action. The term “shall” pervades § 1153(c). In addition to its use in the introductory phrase “diversity immigrants shall be allotted visas,” § 1153(c)(1), Congress repeated the term eleven times in § 1153(c), stating that the INS, the Attorney General, or the Secretary of State “shall” perform certain functions. See § 1153(c)(1)(A) (“[t]he Attorney General shall determine”), (B)(i) (“[tjhe Attorney General shall identify”), (B)(ii) (“[t]he Attorney General shall identify”), (C) (“[t]he Attorney General shall determine”), (D) (“[t]he Attorney General shall determine”), (E)(iv) (“excess visa numbers shall be made available”) (emphases added).
Section 1153(c) also contains clear language directing the INS to distribute all available diversity immigrant visas for a given fiscal year. Most notably, § 1153(c)(l)(E)(iv) gives the Secretary of State the following command:
If the Secretary of State estimates that the number of immigrant visas to be issued to natives in any region for a fiscal year under this paragraph is less than the number of immigrant visas made available to such natives under this paragraph for the fiscal year, subject to clause (v), the excess visa numbers shall be made available to natives (other than natives of a high-admission state) of the other regions in proportion to the percentages otherwise specified in clauses (ii) and (iii).
§ 1153(c)(1)(E)(iv) (emphasis added). By its plain language, § 1153(c)(1)(E)(iv) directs the Secretary of State (and the INS in the course of processing adjustment of status applications) to distribute all available diversity immigrant visas each year. See id. If the Secretary determines that the immigrant visas allocated to one region will not be fully distributed, then those visas must be made available to applicants from other regions. See id. Section 1153(c)(1)(E)(iv)’s clear mandate is that all of the diversity immigrant visas that Congress sets aside be distributed to eligible applicants (i.e. applicants who satisfy § 1153(c)(2)).
Each year the Department of State receives several million applications for the diversity immigrant visa program. In 1997, Nyaga was one of these applicants and on July 1, 1997, he received notification of his selection as one of the 100,000 lucky “winners” chosen to participate in the program.[5] This notification letter made it clear that Nyaga was not automatically entitled to a visa, but did indicate that he was among the “100,000 DV-98 entries [that] were randomly selected” to apply for one of the 55,000 available visas. The letter also instructed Nyaga of the necessary forms that he must file with the National Visa Center[6] and cautioned him *919 to “carefully follow these instructions to increase your chances of possible visa issuance.” A subsequent letter dated September 26, 1997, informed Nyaga that “the 1998 Diversity Lottery Program requires a $75.00 diversity visa processing fee, per person.”[7] This letter notified Nyaga that, as an applicant residing in the United States, he must also apply for an “adjustment of status” directly with the INS, which he did. The INS’ “adjustment of status” application required Nyaga to complete several forms, attach numerous supporting documents “including pictures and [a] medical examination report,” and pay a fee of “$130.00 for applicants 14 years of age or older and $100.00 for applicants under the age of 14.”[8]
It is not disputed that Nyaga properly completed both the diversity visa application and the “adjustment of status” application on or before February 2, 1998. This left the INS just under eight full months to adjudicate his petition before the end of fiscal year 1998. However, other than forwarding his fingerprint cards to the FBI on February 20,1998, the INS did not act upon Nyaga’s petition prior to the end of the fiscal year.[9] Nyaga now quite reasonably argues that, at the very least, his timely completion of the diversity visa program’s procedural and fiscal requirements should have entitled him to an equally timely adjudication of his application. According to the INS, this is not so.
Incredibly, the INS relies upon its own inaction during fiscal year 1998 as the justification for its current impotence to issue Nyaga a visa. Since under 8 U.S.C. § 1154(a)(l)(I)(ii)(II) eligibility for the diversity program is limited to the fiscal year in which the alien was selected to participate, the INS argues that its failure to act upon Nyaga’s application during the 1998 fiscal year renders him statutorily ineligible to receive a diversity visa.[10] See § 1154(a)(l)(I)(ii)(II). To be clear, the INS failed to adjudicate Nyaga’s application during the fiscal year in which he applied and, based on this failure, now contends that Nyaga is no longer eligible for a 1998 diversity visa. The majority reluctantly accepts this argument and, as a consequence, deems Nyaga’s claim for relief moot under § 1154(a)(1)(I)(ii)(II).
I question the propriety of this judgment because, under the majority’s reading of the statute, Nyaga faces an intractable conundrum. Nyaga was rendered technically ineligible for relief under § 1154(a)(l)(I)(ii)(II), not due to any error of his own, but rather as the result of the INS’ unilateral failure to comply with the directives of the INA. Such a result is particularly offensive because it is clear from the statute that Congress expected the INS to perform the ministerial duties required by the program (i.e. to assure the distribution of the allotted visas) and, thus, under § 1153(c), Nyaga was entitled to have the INS adjudicate his timely-filed *920 diversity visa application.[11] See Iddir v. INS, 301 F.3d 492, 500 (7th Cir.2002); Paunescu v. INS, 76 F.Supp.2d 896, 900 (N.D.Ill.1999).
Because, in my view, § 1153(c) of the INA requires the INS to act on diversity visa applications, I believe the district court properly found that mandamus is the appropriate remedy to compel the INS to perform its ministerial role under the INA and adjudicate Nyaga’s application. See Armstrong, 138 F.3d at 1378.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

. The other two subsections of § 1153 are short, and of little relevance to Nyaga’s claims. Specifically, § 1153(c)(2) is an eligibility provision that dictates aliens must have at least a high school education and two years of work experience "in an occupation which requires at least two years of training” in order to receive avisa. § 1153(c)(2). Section 1153(c)(3) dictates that the Secretary of State maintain information on all immigrants issued visas. See § 1153(c)(3).

. An "adjustment of status” is a procedure for becoming an "alien lawfully admitted for permanent residence.” See 8 U.S.C. § 1255(a). It allows resident aliens to remain in the United States during the application process rather than requiring them to leave the country in order to apply.

. As part of the application process, the INS must also interview the applicant and conduct a complete background investigation, including an FBI fingerprint check, a CIA name check, and a records check through the Bureau of Consular Affairs in the applicant’s native country. See 22 C.F.R. § 42.67; Iddir v. INS, 166 F.Supp.2d 1250, 1253 (N.D.Ill.2001).

. The common reference to aliens selected to apply for an immigrant visa under the diversity program as “lottery winners” is something of a misnomer: in reality the alien simply becomes eligible to apply for a permanent visa under the program. "Winning” aliens do not necessarily receive a visa. Typically, the INS selects around 100,000 "winners” for the 55,000 visas that are available each year. See 8 U.S.C. § 1151(e). The INS uses this system because it has found that only around one-half of the aliens selected to apply for diversity visas are both qualified to receive the visa and actually file an application. See Diallo v. Reno, 61 F.Supp.2d 1361, 1363 n. 3 (N.D.Ga.1999).

. The National Visa Center was established and is directed by the Department of State.

. Nyaga paid an application fee of $300.00.

. Nyaga’s application included a payment to the INS of $1,200.00 which included a $130.00 filing fee for his adjustment of status application (1-485), a $1,000.00 "other fee,” and a $70.00 fee for his employment authorization application (1-765).

. This failure by the INS to act was not due to the unavailability of diversity visas that year. When the fiscal year 1998 ended, more than 3,000 diversity visas were left undistributed.

.The INS generously points out that though ineligible for a 1998 diversity visa, Nyaga can reapply to the program each year. As Nyaga must literally "win the lottery” to regain his eligibility, this is hardly a constructive suggestion.

. The INS all but concedes this point in its brief, stating that "Nyaga is arguably entitled to an adjudication of his diversity visa based adjustment application.” INS Br. p. 29.