Mahamadou **SILLAH**, Petitioner,

v.

Christine G. **DAVIS**, et al., **Respondents.**

No. 02–2692–D/V.

United States District Court, W.D. Tennessee, Western Division.

March 17, 2003.

Mahamadou Sillah, WTDF–Mason, West Tennessee Detention Facility, Mason, TN, pro se.

ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2241 ORDER DENYING APPOINTMENT OF COUNSEL AND ORDER CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH

DONALD, District Judge.

On September 5, 2002, the petitioner, Mahamadou Sillah, a detainee at the West Tennessee Detention Facility in Mason, Tennessee ("WTDF"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner paid the habeas filing fee. On September 10, 2002, this Court issued an order directing the respondents to file a response to the petition. On October 2, 2002, respondents filed a motion to dismiss the petition, accompanied by a legal memorandum. Thereafter, on October 16, 2002 and on November 18, 2002, petitioner filed motions seeking appointment of counsel.

In his habeas petition, Sillah makes the following factual allegations:

3. The plaintiff herein SILLAH, Mahamadou[,] is an alien and Native and Citizen of Gambia, who came to the U.S. on/about November 1994 with B2 visa.

4. The petitioner got married to U.S. Citizen on 1996, and filed for adjustment of status.

5. The plaintiff left the U.S. on 1999 with INS travel document, and came back within one month.

6. The plaintiff meet [sic] with the INS on June 2001.

7. On August 1, 2002[,] the plaintiff was driving to OHIO on I–75, and was pulled by state police[.][T]he officer asked if he plaintiff was driving 89 miles per hour? The plaintiff informed the officer that he was going 69 miles per hour.

8. The officer DID NOT GIVE THE PLAINTIFF the reason for pulling him over, yet he questioned him for his license, and asked him for his RACE and background.

9. The plaintiff complied with the officer, but within minutes, the FBI, and the INS were called along with 4 other police cars.

10. The plaintiff was taken in INS custody for no reason after getting pulled over for no reason.

11. The plaintiff has been in custody since 8–1–2002 without paper work, or court appearance.

12. The plaintiff was served with NOTICE TO APPEAR which have wrong information.

13. The plaintiff wrote INS but no respond [sic] came back.

14. The plaintiff is held without bond.

15. The plaintiff is held without court date.

16. The plaintiff has been in custody over one week without court appearance or due process.

The petitioner further contends that the initial stop of his car was made without probable cause, the officer asked his race in violation of his right to Equal Protection, and the officer illegally searched his car without his consent. He seeks an order directing that he be released from custody, directing the Immigration and Naturalization Service ("INS") to provide him with legal status in the United States and to credit the entire time he has been present in the United States toward his eventual citizenship, to correct the INS records in unspecified ways, and "to treat this as a class action for aliens in detention without reason."

Respondents contend that Sillah, a native of Gambia, entered the United States at New York City on a nonimmigrant visitor's visa on November 27, 1994. Response to Petition for Writ of Habeas Corpus, Motion to Dismiss Petition; and Supporting Memorandum, filed Oct. 2, 2002 ("G.Br."), Ex. 1. That visa authorized Sillah to remain in the United States until February 26, 1995. On April 11, 1996, Sillah married Patricia Dantzler, who purports to be a United States citizen. *Id.*, Ex. 2. On or about January 14, 1998, Sillah applied for adjustment of status to that of a lawful permanent resident of the United States, based on his alleged marriage to a U.S. citizen. As part of that process, Ms. Dantzler (who was then known by the name of Patricia Sillah) filed a Form I–30, Petition for Alien Relative, *id.*, Ex. 3, and Sillah filed a Form I–485, Application for Adjustment of Status, *id.*, Ex. 4. On March 8, 1999, the Immigration and Naturalization Service ("INS") approved an application for advance parole to permit Sillah to leave the United States temporarily and to then return to his immigration parole, *id.*, Ex. 5, and issued a Form I–512, Authorization for Parole of an Alien into the United States, *id.*, Ex. 6.[1] Sillah returned to the United States pursuant to the grant of advance parole on or about April 25, 1999. *See* G. Br., Ex. 7. On August 2, 1999, the INS denied the Petition for Alien Relative filed by Ms. Sillah, *id.*, Ex. 9,[2] and also

---

1. *See* Immigration and Nationality Act ("INA" or "Act"), § 212(d)(5), 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.").

2. Ms. Sillah was sent a notice on or about June 10, 1998 directing her to appear at the INS office in New York, with proper identification, on August 2, 1999. According to the INS, "[a] person appeared at the interview claiming to be the petitioner but could not provide proper identification." Accordingly, the Petition for Alien Relative was considered abandoned and was denied without prejudice. *Id.*

denied Sillah's Application for Adjustment of Status, *id.*, Ex. 10.

On August 1, 2002, an officer with the Tennessee Highway Patrol stopped Sillah near Athens, Tennessee. According to a Form I–213, Record of Deportable/Inadmissible Alien, *id.*, Ex. 11, that was apparently prepared by an INS officer who was called to the scene, Sillah was stopped for speeding and, upon being given permission to search the car, the officer found approximately one thousand (1000) "bootleg" compact disks. The officer also determined that the license plate was not registered to the car, which Sillah claimed to own. Sillah also had no driver's license, although he did produce an Ohio state identification card. Upon learning that Sillah was from Gambia, the officer contacted the INS. The INS officer determined that Sillah was in the country illegally and took him into custody. *Id.* That same day, Sillah was notified that he would remain in custody pending removal proceedings before a U.S. Immigration Court. *See id.*, Ex. 32.

On or about August 11, 2002, Sillah requested a custody redetermination hearing before the U.S. Immigration Court in Memphis. *See id.*, Ex. 8. The Immigration Court scheduled a hearing on Sillah's motion to be held at 1:30 p.m. on August 15, 2002. *Id.*, Ex. 13. On August 15, 2002, the District Director of the INS's New York District issued an order revoking Sillah's immigration parole. *Id.*, Ex. 14.[3] Also, at the August 15, 2002 redetermination hearing, the Immigration Judge denied the motion for a determination of Sillah's custody status. G. Br., Ex. 15.[4] Sillah did not appeal this decision.

On August 19, 2002, a Notice to Appear was served on Sillah and was filed with the Immigration Court. G. Br., Ex. 17.[5] The effect of this notice was to formally commence removal proceedings against Sillah.[6] The notice alleged that Sillah is an arriving alien; that he is not a citizen or national of the United States; that he is a native of Gambia and a citizen of Gambia; and that he arrived in the United States at or near New York City, New York on or about November 27, 1994 as a B–1 Nonimmigrant. The legal basis for Sillah's removal from the United States was alleged to be the following:

---

3. *See* 8 C.F.R. § 212.5(e)(2)(i).

4. Respondent contends that "the Immigration Judge ruled that he lacked jurisdiction to redetermine the petitioner's custody status." G. Br. at 7. The order does not explicitly say that, although it does contain the handwritten notation that "Respondent is an arriving." *See* 8 C.F.R. § 3.19(h)(2)(i)(B) ("an immigration judge may not redetermine conditions of custody imposed by the Service with respect to ... [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act"); *Alex Oseiwusu*, 22 I & N Dec. 19, 1998 WL 151437 (BIA 1998) [Interim Decision 3344], *in* G. Br., Ex. 16.

5. According to respondents, this notice replaced an earlier Notice to Appear, dated August 1, 2002, which had been served on Sillah. *See id.*, Ex. 24.

6. A notice to appear is a charging document used to institute deportation (now called "removal") proceedings. 8 C.F.R. § 3.13 (2002). A removal proceeding is not initiated until the charging document has been filed with the appropriate Immigration Court. *See id.*, §§ 239.1(a) ("Every removal proceeding conducted under section 240 of the Act to determine the deportability ... of an alien is commenced by the filing of a notice to appear with the Immigration Court."); 3.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the opposing party ...."); 3.13 ("*Filing* means the actual receipt of a document by the appropriate immigration court.").

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

G. Br., Ex. 17.

On August 29, 2002, a Form I–261, Additional Charges of Inadmissibility/Deportability, was filed that contained the additional factual allegations that Sillah departed the United States and last arrived in the United States at New York, New York on or about April 25, 1999, pursuant to a grant of advance parole; and that he is an intending immigrant not in possession of a valid immigrant visa. *Id.,* Ex. 18.

Sillah was afforded a master calendar hearing before the U.S. Immigration Court on August 29, 2002, *see id.,* Ex. 19, at which time the respondent contends that Sillah admitted the allegations against him and he was found removable by the U.S.

Immigration Court.[7] The respondent contends that Sillah's case was continued until September 5, 2002 for consideration of possible avenues of relief from removal. *See id.,* Ex. 20. On September 5, 2002, respondent contends that petitioner requested additional time from the Immigration Court to consider his options. The hearing was rescheduled for September 19, 2002. *Id.,* Ex. 21.[8] On or about September 10, 2002, Sillah filed a motion seeking a change of venue to New York City. *Id.,* Ex. 22. That motion was denied on September 16, 2002 because "[n]o valid purpose has been alleged for a change of venue" and "[t]his case is close to completion." *Id.,* Ex. 23. Sillah also filed an application for asylum, *id.,* Ex. 26, and the Immigration Court conducted as asylum hearing on September 30, 2002, *id.,* Ex. 25.

■ As a threshold matter, this Court must first consider whether it has subject-matter jurisdiction over Sillah's challenge to the revocation of his immigration parole. In order to put this issue in context, it is necessary briefly to review the statutory provisions and regulations applicable to Sillah's detention. Sillah has been detained as an arriving alien.[9] Once his immigration parole was revoked, he was restored to the status he had at the time of

---

**7.** Respondent has not produced any document, or submitted an affidavit, to support this assertion.

**8.** Although Exhibit 20 indicates that an asylum hearing had been scheduled, the rescheduled hearing was characterized in Exhibit 21 as a removal hearing.

**9.** *See* 8 C.F.R. § 1.1(q) ("The term *arriving alien* means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien

remains such even if paroled pursuant to section 212(d)(5) of the Act, except that an alien who was paroled before April 1, 1997, or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) of the Act."). Although Sillah appears to fall within the last clause of this provision, since he received advance parole before leaving the United States in 1999, *see supra* pp. 591–92, the exception applies only to inspections of arriving aliens pursuant to § 235(b)(1)(A)(i) of the Act, 8 U.S.C. § 1225(b)(1)(A)(i), and does not alter Sillah's status as an arriving alien for all other purposes.

the grant of parole, 8 C.F.R. § 212.5(e)(2)(i), which, in Sillah's case, meant that he re-assumed the status of an arriving alien. *See also* INA § 101(a)(13)(B), 8 U.S.C. § 1101(a)(13)(B) ("An alien who is paroled under section 212(d)(5) . . . shall not be considered to have been admitted."). Thus, notwithstanding the fact that he has been physically present in the United States for some time, Sillah stands in the position of an alien applying for admission to the United States.[10]

Detention of arriving aliens is generally mandatory. Section 235(b)(2)(A) of the Act, 8 U.S.C. § 1225(b)(2)(A), provides that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 240." [11] Moreover, as previously noted, *see supra* p. 591 n. 1, the decision whether to release an arriving alien on parole is committed to the discretion of the Attorney General. INA § 212(d)(5), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5.

Moreover, the Act contains a provision limiting judicial review:

Notwithstanding any other provision of law, no court shall have jurisdiction to review. . . (ii) any other decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General, other than the granting of [asylum] relief under section 208(a).

8 U.S.C. § 1252(a)(2)(B)(ii). "The subchapter referred to is subchapter II of Chapter 12 of Title 8, which covers sections 1151 through 1378." *CDI Information Servs., Inc. v. Reno*, 278 F.3d 616, 619 (6th Cir.2002). Section 1182(d)(5), which governs immigration parole, falls within this subchapter. The statute and the relevant regulation, 8 C.F.R. § 212.5, clearly confers discretion on the INS. *See* 8 C.F.R. § 212.5(c) ("In the case of all other arriving aliens . . ., the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions . . . as he or she may deem appropriate.").[12] Using this analysis, the Sixth Circuit has held that federal courts lack subject-matter jurisdiction to review discretionary decisions by the INS. *CDI Information Servs., Inc.*, 278 F.3d at 619–20 (denial of extension of alien's H1–B nonimmigrant visa); *see also Thomas v. Jenifer*, No. 00–2326, 2002 WL 655522 (6th Cir. Apr.19, 2002) (per curiam) (decision not to grant an immigrant visa).

The Sixth Circuit's decisions in *CDI Information Servs.* and *Thomas* do not, however, compel the conclusion that this Court also lacks subject-matter jurisdiction over the INS's revocation of Sillah's immigration parole. Language in the Supreme Court's decision in *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 311–13, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), suggests that the language "no court shall have jurisdiction to review" does not bar habeas jurisdiction. As the Supreme Court noted, "[a]t no point . . . does [the Illegal Immigration Reform and

---

**10.** *See* INA § 101(a)(4), 8 U.S.C. § 1101(a)(4) ("The term 'application for admission' has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.").

**11.** Section 240 of the Act, 8 U.S.C. § 1229a, governs removal proceedings.

**12.** Likewise, the decision to revoke an alien's immigration parole is itself discretionary. *See* 8 C.F.R. § 212.5(e)(2)(i).

Immigrant Responsibility Act of 1996 ("IIRIRA")] make express reference to § 2241. Given the historic use of § 2241 jurisdiction as a means of reviewing deportation and exclusion orders, Congress' failure to refer specifically to § 2241 is particularly significant." *Id.* at 312 n. 35, 121 S.Ct. 2271; *see also Calcano–Martinez v. Immigration & Naturalization Serv.,* 533 U.S. 348, 351–52, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001). In light of the Supreme Court's decisions in *St. Cyr* and *Calcano–Martinez,* this Court is reluctant to hold that there is no subject-matter jurisdiction to review Sillah's habeas petition.[13]

■ Notwithstanding the fact that this Court has subject-matter jurisdiction over Sillah's petition, courts have recognized the authority of the Attorney General, through the INS, to detain and exclude inadmissible aliens.[14] In that regard, the

courts distinguish between arriving aliens and aliens who are deemed present in the United States. Thus, in *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), the Supreme Court considered a habeas petition filed by an immigrant who had been deemed inadmissible into the United States but was stranded on Ellis Island because no other country would take him. The Supreme Court concluded that, although "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law," *id.* at 212, 73 S.Ct. 625, no such requirement is applicable to aliens seeking entry into the United States. Moreover, respondent's confinement on Ellis Island, which is physically within the United States, did not confer any right to due process. *Id.* at 213, 73 S.Ct. 625 ("harborage at Ellis Is-

13. The Sixth Circuit has not had occasion to address the issue, since neither *CDI* nor *Thomas* arose in the habeas context. However, other courts of appeals have held that the provisions of the IIRIRA do not preclude habeas jurisdiction. *See, e.g., Wang v. Ashcroft,* No. 02–2045, 2003 WL 255958, at *7–*8 (2d Cir. Feb.6, 2003); *Yuthok v. U.S. Immigration & Naturalization Serv.,* 51 Fed.Appx. 204, 205 (9th Cir. Nov.12, 2002) (denial of immigration parole); *Riley v. Immigration & Naturalization Serv.,* 310 F.3d 1253, 1255–56 (10th Cir. 2002); *Chambers v. Reno,* 307 F.3d 284, 288 n. 4 (4th Cir.2002); *Gutierrez–Chavez v. Immigration & Naturalization Serv.,* 298 F.3d 824, 827 n. 3 (9th Cir.2002); *Liu v. Immigration & Naturalization Serv.,* 293 F.3d 36 (2d Cir. 2002). Moreover, although the Government does not cite *St. Cyr,* it seems to undercut its own argument concerning subject-matter jurisdiction when it concedes that "[t]his Court has jurisdiction to address the petitioner's challenge to the lawfulness of his immigration detention." G. Br. at 4.

14. *See, e.g., Immigration & Naturalization Serv. v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially

appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' "); *Reno v. Flores,* 507 U.S. 292, 305–06, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (noting the broad scope of authority over aliens committed to the political branches of government); *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, *for the power to admit or exclude aliens is a sovereign prerogative.*") (emphasis added); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (judicial review over immigration legislation is limited); *Kleindienst v. Mandel,* 408 U.S. 753, 765–67, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (noting the broad scope of Congress's power to make rules for the admission or exclusion of aliens); *Wong Wing .v. United States,* 163 U.S. 228, 236–37, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (noting, *in dicta,* that it is constitutional for Congress to delegate the authority to deport aliens to the executive branch).

land is not an entry into the United States"). Even Congress's creation of immigration parole does not confer rights on the detainee:

> There remains the issue of respondent's continued exclusion on Ellis Island. Aliens seeking entry from contiguous lands obviously can be turned back at the border without more.... While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships to the alien and inconvenience to the carrier persuaded Congress to adopt a more generous course. By statute it authorized, in cases such as this, aliens' temporary removal from ship to shore. But such temporary harborage, an act of legislative grace, bestows no additional rights.... And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border.

*Id.* at 215, 73 S.Ct. 625 (citations and footnotes omitted).[15]

More recently, in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court examined the constitutionality of prolonged detention of resident aliens who had been found to be unlawfully present in the United States and who were being detained pending removal pursuant to 8 U.S.C. § 1231(a)(6). The Supreme Court held that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional question," 533 U.S. at 690, 121 S.Ct. 2491, and

that, "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute," *id.* at 699–700, 121 S.Ct. 2491. In so holding, the Supreme Court distinguished its previous decision in *Mezei* on the basis that the petitioners in *Zadvydas,* unlike those in *Mezei,* had been lawfully admitted to the United States:

> Although *Mezei,* like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States [in *Mezei*] required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was "treated," for constitutional purposes, "if it stopped at the border." ... And that made all the difference.
>
> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.... It is well settled that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders..... But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

533 U.S. at 293, 121 S.Ct. 2271 (citations omitted).[16] Sillah's detention does not

---

**15.** As previously noted, *see supra* p. 591 n. 1, the current statute governing immigration parole, 8 U.S.C. § 1182(d)(5)(A), explicitly provides that "parole of such alien shall not be regarded as an admission of the alien."

**16.** In the quoted passage, the Supreme Court cited, *inter alia,* its previous decisions in *Kaplan v. Tod,* 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585 (1925), which held that an alien

who was held on Ellis Island and, thereafter, with her father in the United States pending execution of a removal order, had never entered the United States, and *Leng May Ma v. Barber,* 357 U.S. 185, 188–90, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958), which held that an alien paroled into the United States pending a determination of her admissibility had not effected an "entry."

raise the concerns addressed by the Supreme Court in *Zadvydas*, because there is no indication in the record· that Sillah cannot be deported to his native country. Accordingly, Sillah has not established any violation of his constitutional rights.[17.]

Sillah also has not attempted to argue that the Attorney General abused his discretion in revoking Sillah's immigration parole. As previously noted, *see supra* p. 591 n. 1, the Attorney General is authorized to parole an arriving alien "for urgent humanitarian reasons or significant public benefit." INA § 212(d)(5), 8 U.S.C. § 1182(d)(5)(A). Not only does Sillah not present any argument that he falls within either of these categories, but decisions concerning the granting and revocation of immigration parole are within the discretion of the Attorney General, *see supra* pp. 591 n. 1, 594, and are not subject to judicial review, 8 U.S.C. § 1252(a)(2)(B)(ii).

For all the foregoing reasons, Sillah is not entitled to relief on his claim challenging his continued confinement.

Sillah also seeks an order directing that he be given legal status in the United States and crediting the entire time he has been present in the United States toward his eventual citizenship. Sillah has not, however, cited authority for the proposition that this Court has the power to grant such relief.

Sillah asks for an order correcting INS records, but he has failed to identify any error in those records.

■ Finally,·Sillah asks that this action be maintained on behalf of a class of aliens "in detention without reason." The Court declines to do so. A party in federal court must proceed either through licensed counsel or on his own behalf. *See* 28 U.S.C. § 1654; *see also* Fed.R.Civ.P. 11(a) ("[e]very pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be·signed by the party"). No *pro se* litigant may sign pleadings on behalf of another litigant. *Johns v. County of San Diego*, 114 F.3d 874, 876 (9th Cir.1997) ("While a non-attorney may appear *pro se* on his own behalf, '[h]e has no authority to appear as an attorney ·for others than himself.'"); *Mikeska v. Collins*, 928 F.2d 126 (5th Cir. 1991); *Bonacci v. Kindt*, 868 F.2d 1442, 1443 (5th Cir.1989).

■ The existence of class allegations does not alter that conclusion, because a *pro se* litigant is not an adequate class representative. *Ballard v. Campbell*, No. 98–6156, 1999 WL 777435, at *1 (6th Cir. Sept.21, 1999); *Giorgio v. Tennessee Dep't of Human Servs.*, No. 95–6327, 1996 WL 447656, at *1 (6th Cir. Aug.7, 1996) ("Because a layman does not ordinarily possess the legal training and expertise necessary to protect the interests of a proposed class, courts are reluctant to certify a class represented by· a pro se litigant."); *see also Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir.1975) (per curiam).

**17.** The Sixth Circuit's decision in *Rosales–Garcia v. Holland*, 238 F.3d 704 (6th Cir.), *vacated sub nom., Thoms v. Rosales–Garcia*, 534 U.S. 1063, 122 S.Ct. 662, 151 L.Ed.2d 577 (2001), to the extent it remains good law, is entirely inapplicable here. The holding in *Rosales–Garcia* is limited to "aliens who were already in exclusion or deportation proceedings prior to the Act's[ ] effective date on April 1, 1997." *Id.* at 712 n. 4. Sillah's exclusion proceeding commenced on or about August 1, 2002. Moreover, *Rosales–Garcia*, involved the indefinite detention of a Cuban national who could not be returned to Cuba. Nothing in the record before this Court suggests that Sillah cannot be returned to his native country.

■ Finally, the fact that Sillah himself does not have a meritorious claim necessitates the dismissal of the class allegations.

For all the foregoing reasons, the Court DENIES the petition in its entirety. Because the petition does not present a potentially meritorious claim, Sillah's motion for appointment of counsel is DENIED.

■ Appeals of habeas petitions under 28 U.S.C. § 2254 and motions under 28 U.S.C. § 2255 are governed by 28 U.S.C. § 2253 and require the district court to consider whether to issue a certificate of appealability. *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063 (6th Cir.1997); *Stanford v. Parker*, 266 F.3d 442 (6th Cir.2001). Section 2253 does not apply to habeas petitions by federal prisoners under § 2241. *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 810 (10th Cir.1997); *Ojo v. Immigration & Naturalization Serv.*, 106 F.3d 680, 681–82 (5th Cir.1997); *Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir.1996). Nevertheless, a habeas petitioner seeking to appeal is still obligated to pay the $105 filing fee required by 28 U.S.C. §§ 1913 and 1917. Under the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915, it is unclear how habeas petitioners establish a right to proceed *in forma pauperis* and avoid this filing fee.

Although the Sixth Circuit has concluded that the various filing fee payment requirements and good faith certifications of amended § 1915 do not apply to § 2254 cases, it has not resolved whether these requirements apply to § 2241 cases. *Kincade v. Sparkman*, 117 F.3d 949, 951–52 (6th Cir.1997); *cf. McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir.1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases, without mentioning § 2241 petitions).

■ The Tenth Circuit, however, has held that the provisions of the PLRA do not apply to habeas cases of any sort or to § 2255 motions. *See McIntosh*, 115 F.3d at 810; *United States v. Simmonds*, 111 F.3d 737, 743 (10th Cir.1997). An unpublished Sixth Circuit opinion has adopted this approach in affirming a decision from this district. *Graham v. United States Parole Comm'n*, No. 96–6725, 1997 WL 778515 (6th Cir. Dec.8, 1997), *aff'g Graham v. United States*, No. 96–3251–Tu (W.D.Tenn. Dec. 4, 1996). Because the Court finds the reasoning of *McIntosh* persuasive, and because the Court finds that this conclusion naturally follows from the Sixth Circuit's decision in *Kincade*, the Court concludes that the PLRA does not apply to § 2241 petitions. *Cf. Greene v. Tennessee Dep't of Corrections*, 265 F.3d 369 (6th Cir.2001) (certificate of appealability requirement is applicable to state prisoner bringing § 2241 petition).

Pursuant to *Kincade*, a petitioner must seek leave to proceed *in forma pauperis* from the district court under Fed. R.App. 24(a), which provides:

A party to an action in a district court who desires to proceed on appeal *in forma pauperis* shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress, and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith, and to deny the certificate if the appeal would be frivolous.

The good faith standard is an objective one. *Coppedge v. United States*, 369 U.S. 438, 445, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The same considerations that lead the Court to dismiss this petition also compel

the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R.App. P. 24(a), that any appeal in this matter by petitioner is not taken in good faith, and he may not proceed on appeal *in forma pauperis.*